(No. 35102.—)

R. S. MONTGOMERY *et al.,* Appellants, *vs.* PAULINE DOWNEY *et al.,* Appellees.

*Opinion filed September 24, 1959—Rehearing denied Nov. 17, 1959.*

G. W. HORSLEY, of Springfield, for appellants.

GLENN RATCLIFF, of Lewistown and JOHN E. GROS-BOLL, of Petersburg, for appellees.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

In November of 1947 the plaintiffs instituted this proceeding in the circuit court of Menard County. Initially the plaintiffs sought a mandatory injunction to compel the defendants to remove certain alleged obstructions to the natural flow of surface waters from the lands of the plaintiffs and to permanently enjoin the defendants from any future obstruction of water flow.

The complaint alleges that the land of the plaintiffs is the dominant estate and that the natural flow of surface waters was from the plaintiffs' land over and across the land of the defendants. The obstructions in the form of levees allegedly caused the surface waters to back up and stand on the plaintiffs' land. In addition to the equitable relief asked in the original complaint, the plaintiffs, by amendment filed in August of 1949 concurrently with a change in plaintiffs' counsel, sought also the recovery of

damages for the alleged loss of use of the land thus affected, as well as damages for an alleged decrease in the value by reason of the interference with the natural drainage.

In 1949 the case was referred to the master in chancery, and later, in 1950, on plaintiffs' motion, the order of reference to the regular master was vacated and the cause was referred to a special master.

After reference to the special master a large volume of testimony was taken relating to all phases of the facts in controversy. The taking of this testimony was spread over many sessions before the special master.

Finally, in July of 1957, the report of the special master was filed; exceptions thereto were overruled in August of 1958; and a decree was then entered by the circuit court in accordance with the recommendations of the special master. The decree dismissed, for want of equity, that portion of the complaint seeking equitable relief, and the claim for damages was likewise dismissed as being without merit. This appeal is from the decree so entered.

Inasmuch as this case involves the existence of a perpetual easement of drainage in favor of the plaintiffs' land, a freehold is involved and this court has jurisdiction on direct appeal. *Gough* v. *Goble,* 2 Ill.2d 577.

Although no pleading or procedural question is involved on this appeal, it is necessary to refer to the pleadings to ascertain the facts not in controversy. For the most part, the testimony of the parties and the opinion testimony presented before the master is very much in conflict on the material factual considerations.

The plaintiffs are the owners of a certain tract of ground in Menard County, described as "The East Half (E½) of the Southwest Quarter (SW¼) of Section Twenty-one (21), Township Nineteen (19) North, Range Six (6) West of the Third Principal Meridian." This land will hereinafter be referred to as "Tract No. 1." The defendant Boske is the owner of land described as "The South Half (S½)

of the Southwest Quarter (SW¼) of the Northeast Quarter (NE¼)" of the same section, and this defendant's land will hereinafter sometimes be referred to as "Tract No. II." The defendants Downey are the owners of "The South Half (S½) of the Northwest Quarter (NW¼)" of that section, and that property will hereinafter be referred to as "Tract No. III." The defendant Kaiser is the owner of real estate described as "The Northwest Quarter (NW¼) of the Northwest Quarter (NW¼)" of that section, together with certain property located in section 20 of the township and range above indicated, and his property will hereinafter be referred to as "Tract No. IV."

Thus it appears that the plaintiffs are the owners of acreage lying south of Tracts Nos. III and IV and west and somewhat south of Tract No. II. The evidence is that Tract No. I is the dominant estate or the land of higher elevation, and that Tracts Nos. II and III are servient thereto or lands of the lower elevation, and that Tract No. IV is of a lower elevation still. The evidence is, further, that there is a stream or creek, known as Cabanas Creek, which drains the lands of the plaintiffs and the defendants and flows across a portion of Tract No. I and then turns northwardly, leaving Tract No. I, and continues in a general north direction across Tract No. III and then northwestwardly across a portion of Tract No. IV. In addition to the land of the plaintiffs and defendants involved in this litigation, the evidence is that this creek also drains a substantial amount of acreage lying upstream above the lands of the plaintiffs.

The plaintiffs claim that some six acres of their property, situated in the northeast corner of Tract No. I and on the righthand side of Cabanas Creek as it crosses their tract, has been affected by work done by the defendants on certain levees admittedly existing for a long period of years. It is uncontroverted that Cabanas Creek is, and for many years has been, subject to frequent overflows and

that when the rainfall is sufficient to cause an overflow of this creek, the flood waters flow over the plaintiffs' land, which was purchased by them in 1935. Indeed, one of the plaintiffs testified that since his purchase of the land this creek has overflowed to some extent each spring, the extent of the overflow being, of course, directly dependent upon the volume of rainfall.

It is also uncontroverted that for well over 50 years a levee had existed along the south side of the land of the defendant Downey, Tract No. III, which lies immediately north of the plaintiffs' land. This levee was in existence in 1892 when the defendant Downey first became acquainted with the land. At that time, the levee extended in an eastwardly direction over into Tract No. II. Notwithstanding the existence of this levee, the evidence is that the water often overflowed the levee and that sometimes the overflow would cause washing, resulting in holes in the levee. These holes were periodically repaired.

In 1944 there were some such holes washed in the levee so that the defendant Downey contracted for the repair of the levee. The repair work consisted of rebuilding the levee back to what it was prior to the overflow and the washing out. The person who did the repair work did not think that he raised the over-all height of the levee, although his testimony in that regard is somewhat less than definite. He did not in the course of the repair of this levee make any extension of the levee.

Concurrently with this repair of the levee on Tract No. III, the same person worked on a levee of the plaintiffs which is located across the creek bottom, south of Tract No. III and running north and south along the east side of plaintiffs' land, but south of Cabanas Creek. This levee, too, was washed out and it was leveled off and rebuilt so as to effect a filling of the low places. This work on the plaintiffs' levee was done immediately after the completion of the levee repair work on Tract No. III.

In 1947 the defendants Downey and Kaiser constructed a new channel for Cabanas Creek. The new channel commenced on Tract No. III at the point where the creek enters Tract No. III from the land of the plaintiffs, and the new channel extends across Tract No. III in a northwesterly direction, terminating in the old channel at a point near the north line of the Kaiser land or Tract No. IV. All of the construction of the new channel for this creek was on the land of the defendants Downey and Kaiser or on Tracts Nos. III and IV. In the course of the construction of this new channel the earth removed was placed to the right of the new channel and formed a mound or levee of a height above the natural ground surface. Before the construction of the new channel, the old channel, as we have indicated, went north and westerly and made irregular bends, and proceeded across Tract No. IV. In the process of crossing Tracts Nos. III and IV, the creek was said to have made four or five horseshoe-type bends, which in time of overflow would result in water running in all directions. The new channel was in a relatively straight line and at the point where it commenced on Tract No. III after leaving plaintiffs' land, it was deeper than the old channel. The evidence is rather conclusive that the new channel was larger, more direct and would handle a larger volume of water than the old channel. After the completion of the construction of the new channel, the old channel on Tracts Nos. III and IV was filled.

In connection with the construction of the new channel for Cabanas Creek, the defendants Downey and Kaiser also changed the west end of the levee along the south line of Tract No. III, which consisted of removing a portion of the old levee which had run along the old creek channel and constructing a new levee from the old west terminus, a distance of over 100 feet to the west end, then curving it to the northwest to connect with the levee along the new channel formed by the earth removed in the ex-

cavation of the new channel. As is true with most of the factual matters involved in this litigation, there is a conflict as to the length of the extension of the levee on Tract No. III to the west of the former terminus of the levee and a conflict on the question of the distance that this new levee is from the channel of Cabanas Creek. The plaintiffs assert that it is a 170-foot extension. The defendants claim the extension to be some 100 feet. Inasmuch as there is a dispute as to the length of an extension of the levee, it is not at all surprising that there is a hopeless conflict in the evidence as to the effect of the construction of a new channel for the creek.

Both sides have done an excellent job of preparing and presenting documentary material, plats, surveys, aerial photographs, all buttressed with expert engineering testimony. There is testimony that the construction of the new channel would permit faster removal of flood waters, with a capacity of some three times more than the old channel. There is testimony to the effect that the construction of the new channel impeded the flow of the flood waters, created a bottleneck and resulted in a greater overflow, in times of flood, of the plaintiffs' land.

The plaintiffs contend that the repair of the levee in 1944, as above described, was more than a filling of existing washed out places but, rather, was a rebuilding of the levee and an increase in its height by at least one foot, resulting in an increase in the water damage to the plaintiffs' land at times of flooding.

The master found that for over 60 years Tract No. II and a portion of Tract No. III had been protected by a levee along the south and east lines thereof parallel with the boundary of Tract No. I, and that the defendant owners of Tracts Nos. II and III had a right to maintain the levee. Further, the 1944 work on the then levee was found to be maintenance work only and not to have raised or extended the existing levee.

It has long been settled in this State that the owner of land which by reason of its elevation is servient to, and provides natural drainage for, the surface waters of higher lands may, by prescription, obtain an easement to free his land of the natural burden. Thus, as to surface water drainage, it may be said that the dominant land has a benefit and the servient land a burden and that, by the construction of a levee or other barrier to the natural drainage, the owner of the servient land may, if such obstruction is maintained for the prescriptive period, reverse the benefit and burden situation in that the servient land becomes benefited by being kept free of surface waters, and those waters are backed up upon the dominant land, thereby burdening it. Once such an obstruction has been maintained for the prescriptive period, it may be said to have ripened into an easement, and the owner of the servient estate then has the right to maintain and keep the levee or obstruction at its original height and may make such repairs as may be required to so maintain it. However, in the absence of further expansion of the easement by prescription, the right to maintain does not permit of raising the levee so as to cause greater flow or damage to the land of the plaintiffs. (*Beechley* v. *Harms*, 332 Ill. 185.) The parties here are in disagreement as to whether or not the work in 1944 on the levee was within the permissive category of maintenance or whether it was an effort to raise and extend the levee.

One of the defendants, Downey, testified that the levee had been in existence for over 50 years; that prior to 1900 he had assisted in the repair of the levee, and on this and later occasions the levee had been repaired by the filling of holes that would wash in the levee. He further stated that the levee did extend from Tract No. III to Tract No. II. This same witness stated that the levee was not raised in 1944. The testimony of the plaintiff Montgomery is to the effect that the levee was raised and that, in the course

of the 1944 work, it was extended so as to then reach Tract No. II.

The evidence of other witnesses is just as conflicting and contradictory as is the evidence of the parties above set forth. Even engineers who made excavations in the levee in an effort to ascertain whether or not it had been raised gave conflicting opinions. Compounding the conflicting testimony is the testimony of Lee Sharon, the person who did the work on the levee in 1944. This witness stated that at the time he commenced the work the levee was narrow on top and that, in order to get his machinery on top of the levee, he first had to cut off and broaden the top of the levee and then proceed to rebuild it and by this process to fill in the low or washed out places. It thus becomes understandable that the excavations made by the engineers could vary depending upon whether the excavation did or did not hit at a spot where the levee had been cut down and then refilled.

The foregoing portions of the evidence are set forth to indicate the conflict running throughout the record before us. There is even a controversy as to the year in which the work was done.

The master heard and saw the witnesses. He, at first hand, could measure the testimony by reference to supporting engineering and documentary evidence or exhibits. While the findings and recommendations of the master are of an advisory nature only, having been approved by the chancellor, those findings and recommendations are entitled to great consideration. (*County of Cook* v. *Glasstex Co.* 16 Ill.2d 72.) It is, however, true, as the plaintiffs suggest, that this court is not bound to follow the findings of the master where the record indicates that he has erred in appraising the evidentiary value of the testimony. (*Gilbert* v. *Chicago Title and Trust Co.* 7 Ill.2d 496.) Our review of the testimony as to the repair work performed in 1944

convinces us that the findings of the master are in accordance with the great weight of the evidence, and we find no basis, therefore, to disturb those findings as the same were approved by the chancellor to the effect that, in 1944, the levee was not raised but work was done thereon of a repair and maintenance nature only, and that the work thus performed was of a type which the defendants then had a right to do.

The main contention between the parties in this case, however, is in regard to the sufficiency of the new channel constructed by the defendants as compared to the old channel of Cabanas Creek with its overbank sections which existed prior to the new construction. It is the contention of the defendants that the new channel will carry the flooding surface waters away from the plaintiffs' land faster and in greater volume than through the old, natural channel. As in other matters presented at the several hearings in this case, there is considerable difference in the testimony regarding the sufficiency of the new channel. Evidence was given by surveyors and engineers, and lay witnesses gave testimony as to the sufficiency of the new channel, the capacity of which was tested by a flood in June of 1951. Upon review of the varying testimony of the engineers presented as witnesses, there seems to be no definitive way of measuring the capacity of the old channel, which is now filled, it seems that a precise engineering comparison with the new channel would be impossible. The lay witnesses' testimony seems to be to the effect that the water does move faster and in greater volume through the new channel than it did through the old channel. This is based upon the testimony of residents of the area who, as such, witnessed flood conditions in the general area. Although the flood of June of 1951 was, in the opinion of these lay witnesses, of varying severity, these witnesses were, for the most part, uniform in their opinion that the new channel was preferable to the old as a means of removing the flooding surface

waters; although, even with the new channel, it was agreed that there was flooding, and the result obtained was not a freedom from flooding on the part of the lands of the parties but, rather, a decrease in the time that the flood waters were retained on the various lands.

The new channel that was constructed in 1947 commenced on Tract No. III, a very short distance from the north boundary of Tract No. I, and proceeded in a northwesterly direction across Tract No. III and onto Tract No. IV, at which point it turned to the west. All of the new construction of this channel was on land owned by the defendants and this new channel emptied on land not owned by the plaintiffs. The owner of land may change the course of a natural stream within the limits of his own land if, before the new channel leaves his land, he restores it to the original channel; provided, of course, that in making the change he does not cast upon the lands of an adjoining proprietor water which did not in the natural course of drainage flow upon such adjoining premises. (*Daum* v. *Cooper,* 208 Ill. 391.) The defendants had the right to make the change in the channel of Cabanas Creek, subject, however, to the limitation that the new channel must be of equal or greater capacity than that which existed prior to the change. In making the change they were under no obligation to locate the new channel in accordance with the wishes of the plaintiffs, nor were they under an obligation to construct a new channel of sufficient capacity to keep all flood waters from the land of the plaintiffs. Their obligation was completely satisfied when, in constructing the new channel, they made it equal in capacity to, or greater than, the capacity of the natural stream. *Rock Island and Peoria Railway Co.* v. *Krapp,* 173 Ill. 219.

The abstract of the record in this case is in two volumes and there is a third volume for engineering and documentary exhibits. A further recitation of the evidence in this case would only serve to unreasonably lengthen this opinion.

462

From a careful review of all of the matters in the record, we do not find that the plaintiffs sustained the burden of proof of any injury to their land greater than that which the land had for many years past sustained in times of flooding. Although there is a conflict in the testimony, it cannot, in fairness, be said that the findings and conclusions of the special master were contrary to the manifest weight of the evidence, and the decree of the circuit court of Menard County entered in accordance with those findings is affirmed.

*Decree affirmed.*