COLWELL SYSTEMS, INC., Plaintiff-Appellee, *v.* MAX HENSON, Defendant-Appellant.

Fourth District   No. 4—82—0680

Opinion filed August 12, 1983.

Ted Crewell, of Pelini, Crewell & Sheffler, of Urbana, for appellant.

Michael J. Tague, of Franklin, Flynn & Palmer, of Champaign, for appellee.

JUSTICE MILLER delivered the opinion of the court:

The Boneyard Creek runs through the plaintiff's and the defendant's adjacent tracts of land in Champaign. In 1971 the defendant, who is the upstream or dominant owner, replaced the natural channel of the creek with culverts, laying them side by side in the creek bed. In 1979 the plaintiff's basement was flooded, and the plaintiff sued, alleging that the defendant's culverts had caused the flooding because they could not carry off large amounts of water. The trial court granted the plaintiff's motion for summary judgment on the question of liability and later awarded about $280,000 in damages. The defendant appeals, arguing that the trial court erred in granting summary judgment; he does not attack the amount of damages awarded. We reverse and remand.

Because the defendant's liability was decided by summary judgment, we must examine the five documents that the motion relied on: the complaint, the answer, the defendant's answers to interrogatories, an admission of facts, and an affidavit. These are summarized below, with some repetition of detail.

The plaintiff's complaint comprised two counts; both counts alleged that the creek naturally drained water from the defendant's property before the culverts were installed, that the defendant "unlawfully and wrongly installed enclosed drainage culverts replacing the natural open channel of the Boneyard Creek," and that the plaintiff's basement was flooded July 30, 1979, as a result of the defendant's activity. Count I, which the plaintiff in its brief on appeal classi-

fies as a riparian theory, alleged that the installation of the culverts "has caused and still causes the water in said watercourse to back up over the inlets of said culverts and flow unnaturally in a northeasterly direction onto Plaintiff's leasehold." Count II, which the plaintiff calls its negligence count, alleged seven negligent acts and omissions: The defendant (1) installed the culverts without adequate engineering plans, (2) knew or should have known that the culverts would affect the natural surface drainage in the area, (3) failed to obtain the permission or advice of the Urbana-Champaign Sanitary District, (4) installed culverts that were too small, (5) knew or should have known that the culverts "consistently failed to properly handle the drainage water flowing in the Boneyard Creek, and that heavy rains could cause large amounts of water to flow onto Plaintiff's leasehold," (6) failed to take out the culverts or replace them with larger ones once he knew or should have known that they were inadequate, and (7) contrary to the sanitary district's "direction" failed to take out the culverts or replace them with larger ones.

The defendant's answer was a general denial of liability and did not raise any affirmative defenses or counterclaims.

The defendant's answers to interrogatories provide some helpful information. According to the answers, installation of the culverts was begun during the summer of 1971 and finished that fall; the defendant was his own contractor for the work and did not hire any subcontractors or engineers. He installed two culverts, one 42 inches in diameter and one 36 inches in diameter; both were 200 feet long and laid down the center part of the creek bed. The defendant obtained the permission of the Urbana-Champaign Sanitary District. On September 10, 1971, the district's engineer-manager wrote to the defendant that the district had approved his proposal "to install two 42-inch metal culverts for the west 170 feet of the Boneyard south of [his] property." The letter also referred to the defendant's promise "to assume full responsibility."

The plaintiff filed a request for admission of facts, and, because the defendant never denied them, they stand admitted under Supreme Court Rule 216(c) (87 Ill. 2d R. 216(c)). None of the facts are controversial, and the following are relevant here: The creek flows through the south sides of the parties' lots; the direction of the flow is from west to east; in 1971 the defendant replaced the creek's open channel with culverts; before this the surface water on the defendant's property drained to the south, into the creek; on July 30, 1979, water in the creek backed up over the inlets of the culverts and flowed northeasterly onto the plaintiff's land, flooding its basement.

The last document supporting the motion for summary judgment was the affidavit of Walter F. Baselt, the plaintiff's vice-president for plant and personnel. Baselt said that on and before July 30, 1979, the date of the flood, that portion of the creek immediately upstream of the plaintiff's lot was enclosed, and the flow was carried by two pipes; both were 36 inches in diameter at their downstream ends, and at their upstream ends one was 42 inches in diameter and the other 36 inches in diameter. A third pipe, 36 inches in diameter, was next to the other two for part of the distance, but both its ends were capped shut with masonry plugs. Baselt said that on numerous times before July 30, 1979, the creek had overflowed its banks, forcing water onto the plaintiff's land. On that date the overflow from the creek reached and descended over the driveway ramp going down to the plaintiff's basement; the flow at the top of the driveway was 12 feet wide and five to seven inches deep.

The defendant did not present any counteraffidavits or attack the sufficiency of Baselt's. The trial court granted the plaintiff's motion for summary judgment but did not specify the theory or theories sustaining liability. After hearing evidence on damages, the court awarded the plaintiff $280,891.76.

On appeal the defendant argues that a question of material fact—proximate cause—existed and prevented the trial court from granting summary judgment on the issue of liability. The plaintiff argues that even if causation was an open question under its negligence theory, its riparian theory entitled it to summary judgment. According to the plaintiff, to succeed under the riparian theory it had to prove only "that waters were unlawfully diverted onto its land and that such diverted waters caused the plaintiff damage." The plaintiff relies on the admitted facts and Baselt's affidavit as proof of this theory.

We must first correct a misnomer: the plaintiff's first count does not actually present a riparian theory. Although the plaintiff and defendant are riparian owners, riparian rights are not involved here. "Riparian rights," a term of art, denotes the interest that a possessor of land has in the use of a watercourse running along or through his land. (See Restatement (Second) of Torts secs. 841 through 857 (1979).) The plaintiff's complaint is for harm caused by water, not for interference with its use of water.

Although the defendant has not preserved any objections to the formal sufficiency of the complaint, we must first determine what interest of the plaintiff the defendant allegedly invaded. A trespass is an invasion "in the exclusive possession and physical condition of land" (Restatement (Second) of Torts, ch. 7, at 275 (1965)), and a pri-

vate nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land" (Restatement (Second) of Torts sec. 821D, at 100 (1979)). Although trespass and private nuisance are distinct fields of tort liability, they may overlap, and in an appropriate case an action may be maintained for both:

"An invasion of the possession of land normally involves some degree of interference with its use and enjoyment and this is true particularly when some harm is inflicted upon the land itself. The cause of action for trespass has traditionally included liability for incidental harms of this nature. If the interference with the use and enjoyment of the land is a significant one, sufficient in itself to amount to a private nuisance, the fact that it arises out of or is accompanied by a trespass will not prevent recovery for the nuisance, and the action may be maintained upon either basis as the plaintiff elects or both. Thus the flooding of the plaintiff's land, which is a trespass, is also a nuisance if it is repeated or of long duration." (Restatement (Second) of Torts sec. 821D, comment *e*, at 102 (1979).)

We construe both counts of the complaint here as alleging a trespass, for the plaintiff is suing for only a single instance of flooding and has not alleged the duration of the flood.

In analyzing torts one must distinguish between the interest that is invaded and the conduct that causes the invasion. (See *Dial v. City of O'Fallon* (1980), 81 Ill. 2d 548, 554, 411 N.E.2d 217, 220 ("the allegations of the complaint refer only to a trespass without specifying whether the intrusion was intentional or negligent").) Count II clearly alleges a negligent intrusion, and for our purposes here we construe count I as alleging an intentional intrusion. Thus, we construe the complaint as setting forth alternative theories of recovery for one event and injury—the flooding that occurred July 30, 1979.

One is not liable for an intentional trespass unless his acts pose "a high degree of certainty that an intrusion of another's property will result" (*Dial v. City of O'Fallon* (1980), 81 Ill. 2d 548, 555, 411 N.E.2d 217, 221 (interpreting section 158 of the Restatement (Second) of Torts (1965), on intentional intrusions)). Proof of this was absent here. Furthermore, the plaintiff has failed to show under either of the counts that the defendant's installation of the culverts altered the customary flow of water across its land.

*Montgomery v. Downey* (1959), 17 Ill. 2d 451, 162 N.E.2d 6, shows that a landowner that complains of flooding after a neighbor changes a stream cannot rely only on the fact that the injury occurred after the change was made. There, a stream ran through the plain-

tiff's dominant land and then through the servient land of one of the defendants; that defendant dug a new channel for the stream and filled in the old. The plaintiff sued, arguing that the new channel was too small to handle large amounts of rainfall and had caused his land to become flooded during a wet period. The supreme court reviewed the evidence and affirmed the trial court's decision that the defendant's new channel had not increased the flooding. Because the capacity of the old, filled-in channel could not be measured, in assessing the effect of the change the supreme court relied more on the nearly uniform testimony of lay witnesses than on the conflicting, expert testimony of several engineers. In comparing the amount of flooding before and after the new channel was dug, the lay witnesses "agreed that there was flooding, and the result obtained was not a freedom from flooding on the part of the lands of the parties but, rather, a decrease in the time that the flood waters were retained on the various lands." (17 Ill. 2d 451, 461, 162 N.E.2d 6, 12.) Therefore, the change in the channel had not increased the customary or otherwise expected flooding of the plaintiff's land. The court cited *Daum v. Cooper* (1904), 208 Ill. 391, 70 N.E. 339, for this rule:

> "The owner of land may change the course of a natural stream within the limits of his own land if, before the new channel leaves his land, he restores it to the original channel; provided, of course, that in making the change he does not cast upon the lands of an adjoining proprietor water which did not in the natural course of drainage flow upon such adjoining premises." *Montgomery v. Downey* (1959), 17 Ill. 2d 451, 461, 162 N.E.2d 6, 12.

The plaintiff here has not shown that the defendant's activity caused or aggravated the flooding in question. If the defendant did not increase the customary flood or redirect its flow, then under *Montgomery* and *Daum* he cannot be held liable.

The defendant did not move to strike Baselt's affidavit and did not present any counteraffidavits. A counteraffidavit is not necessary, but the failure to file one leaves the opponent of the motion at risk, for the assertions in the affidavit must then be taken as true, even though the opponent's pleadings contain contrary assertions (*Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 587, 272 N.E.2d 497, 500-01). The benefit of this rule to the movant is of course limited to what his affidavits and other supporting documents assert; the movant's right to summary judgment must be evident from them.

The affidavit and admitted facts here show only that the defendant replaced the natural channel of the creek with culverts

along its course through his property, that the culverts were of certain sizes, that the creek periodically flooded, and that on July 30, 1979, the creek backed up over the inlets of the culverts, flowed onto the plaintiff's land, and flooded its basement. This is insufficient to entitle the plaintiff to summary judgment. We have no evidence that the defendant's activity altered the normal course or flood of the creek or cast onto the plaintiff's land water that would otherwise drain into the creek. Baselt's affidavit does not present even a layman's comparison of the situation before and after the culverts were set in place. Questions of material fact therefore remain—among those, whether the defendant caused the plaintiff's harm—and so the trial court erred in granting the plaintiff's motion for summary judgment.

Reversed and remanded.

WEBBER, P.J., and TRAPP, J., concur.