**PIPEFITTERS WELFARE EDUCATION-AL FUND, a Missouri employee benefits fund, Plaintiff–Appellant,**

v.

**WESTCHESTER FIRE INSURANCE COMPANY, a New York corporation, and International Insurance Company, an Illinois corporation, Defendants–Appellees.**

No. 91–3285.

United States Court of Appeals, Seventh Circuit.

Argued April 29, 1992.

Decided Sept. 28, 1992.

David Herndon, Charles V. Marshall, Lakin & Herndon, Wood River, Ill., John H. Goffstein, Bartley & Goffstein, Clayton, Mo., and Thomas J. Wilcox, James T. Price (argued), and Mark A. Thornhill, Spencer, Fane, Britt & Browne, Kansas City, Mo., for plaintiff-appellant.

John S. Sandberg, Rodney M. Sharp, Sandberg, Phoenix & Vongontard, St. Louis, Mo., and Lawrence M. McHeffey (argued), and Margaret F. Catalano, McElroy, Deutsch & Mulvaney, Morristown, N.J., for defendants-appellees.

Thomas W. Brunner, Robert B. Bell, and Nancy J. Lemay, Wiley, Rein & Fielding, Washington, D.C., for amicus curiae.

Before FLAUM and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

Pipefitters Welfare Educational Fund (Pipefitters) brought this diversity suit seeking, among other things, a declaration of its rights under two liability insurance policies purchased from International Insurance Company (International) and Westchester Fire Insurance Company (Westchester). The district court, on the parties' cross motions for summary judgment, ruled that the insurers had no duty to defend or indemnify Pipefitters for any losses arising out of a lawsuit filed by Sidney S. Arst Company (Arst). Pipefitters appeals. We affirm as to the International policy, but reverse the court's ruling regarding Westchester's duty to defend, and remand for further proceedings.

## I.

Pipefitters, an employee benefits fund, purchased an electrical transformer in 1968 for use at its garage in St. Louis, Missouri. The transformer was disconnected in 1976, and remained on the premises until February 1988, when Pipefitters sold it to Arst, a

scrap metal processor and dealer located in Madison, Illinois. Shortly thereafter, an Arst employee cut the transformer open with a blow torch while preparing it for resale as scrap. Unbeknownst to him, the transformer contained approximately 80 gallons of oil laden with polychlorinated biphenyls (PCBs), all of which spilled onto the premises.

Arst blamed Pipefitters for the mishap, and brought suit under federal and state environmental statutes and state common law. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* No. 89–5029 (S.D.Ill.). Arst's suit alleges that Pipefitters unlawfully disposed of the transformer by failing to warn Arst—as required under state and federal law—that the transformer contained PCBs. Arst seeks relief for damages arising from consequences of the spill, including cleanup costs it incurred to comply with federal and state environmental law, diminution of property value, the imposition of an environmental reclamation lien on the property by the Illinois Environmental Protection Agency (IEPA), and its restricted access to the site following IEPA's placement of a "seal order" thereon.

■ Pipefitters timely notified the insurers of the suit, and requested a defense and indemnification, seeking coverage under two separate provisions of each policy. The first provision, contained in the general liability section of each policy, covers liability arising from property damage. The second, contained in endorsements to the main policies, covers liability arising from personal injury. The insurers denied Pipefitters' request for coverage on the ground that Arst's suit falls within the purview of a pollution exclusion clause included in both policies. In the event we find that the pollution exclusion clause applies only to property damage coverage and not personal coverage, the insurers contend that Arst's suit does not allege that Pipefitters committed a "personal injury" offense as the term is defined by the policies. The district court agreed with both of the insurers' contentions. We review *de novo* the court's grant of summary judgment to the insurers. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.,* 914 F.2d 900, 905 (7th Cir.1990), as well as its construction of the insurance provisions at issue. *Community State Bank v. Hartford Ins. Co.,* 187 Ill.App.3d 110, 134 Ill.Dec. 810, 812, 542 N.E.2d 1317, 1319 (1989).[1]

## II.

■ We first consider coverage under the Westchester policy. The legal rules governing the interpretation of insurance contracts are well settled. In determining whether Westchester owes Pipefitters a duty to defend, we look to the allegations in Arst's complaint. If the complaint states a claim that is within, or even potentially or arguably within, the scope of coverage provided by the policy, Westchester must provide a defense. *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.,* 144 Ill.2d 64, 161 Ill.Dec. 280, 284, 578 N.E.2d 926, 930 (1991); *Butters v. City of Independence,* 513 S.W.2d 418, 424 (Mo. 1974). In comparing the complaint with the policy terms, we look not to the particular legal theories pursued by Arst, but to the allegedly tortious conduct underlying its suit. *Colton v. Swain,* 527 F.2d 296, 303–04 (7th Cir.1975); *Western Casualty & Sur. Co. v. Adams County,* 179 Ill.App.3d

---

1. The district court applied Missouri law, but Pipefitters contends that Illinois choice of law principles, *see Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593, 596 (1970), require the application of Illinois substantive law. Pipefitters nonetheless acknowledges—and the insurers, while maintaining that the district court properly applied Missouri law, do not dispute—that the legal standards governing insurance contract interpretation are, as a general matter, the same in both Illinois and Missouri. The two jurisdictions may differ on only one potentially relevant question: whether the property damage provision in both policies affords coverage for cleanup response costs incurred under federal law. *See Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co., Inc.,* 842 F.2d 977, 985–87 (8th Cir.) (en banc) (under Missouri law, CERCLA response costs are not "damages" covered by standard liability policy), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). As it turns out, our disposition of this case renders that question moot, and we therefore need not choose between Illinois and Missouri law.

752, 128 Ill.Dec. 621, 623, 534 N.E.2d 1066, 1068 (1989); *Zipkin v. Freeman*, 436 S.W.2d 753, 754 (Mo.1968) (en banc). Westchester may refuse to defend only if it is clear from the face of Arst's complaint that the allegations therein are not covered. *Conway v. Country Casualty Ins. Co.*, 92 Ill.2d 388, 65 Ill.Dec. 934, 936, 442 N.E.2d 245, 247 (1982); *Spaete v. Automobile Club Inter–Insurance Exch.*, 736 S.W.2d 480, 482–83 (Mo.App.1987). Moreover, because Arst's suit alleges several theories of recovery, Westchester must provide a defense if any portion of the complaint falls within the terms of the policy. *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24, 28 (1976); *Harold S. Schwartz & Assoc., Inc. v. Continental Casualty Co.*, 705 S.W.2d 494, 497 (Mo.App.1985). We must give policy language its plain and ordinary meaning, *Wilkin Insulation*, 161 Ill.Dec. at 284, 578 N.E.2d at 930; *Maryland Casualty Co. v. Huger*, 728 S.W.2d 574, 579 (Mo.App.1987), and resolve any ambiguities or equivocal expressions in favor of Pipefitters, *Wilkin Insulation*, 161 Ill.Dec. at 284, 578 N.E.2d at 930; *Howard v. Russell Stover Candies, Inc.*, 649 F.2d 620, 624 (8th Cir.1981) (Missouri law), but not create any ambiguities where none exist. *Economy Fire & Casualty Co. v. Bassett*, 170 Ill.App.3d 765, 121 Ill.Dec. 481, 483, 525 N.E.2d 539, 541 (1988).

### A.

The Westchester policy defines "personal injury," in pertinent part, as an

injury arising out of one or more of the following offenses committed during the policy period:

(1) false arrest, detention, imprisonment, or malicious prosecution;

(2) wrongful entry or eviction or other invasion of the right to private occupancy;

(3) a publication or utterance [constituting a libel, slander, or invasion of privacy].

Pipefitters maintains that Arst's suit alleges an offense sounding in "wrongful entry or eviction or other invasion of the right to private occupancy." Westchester dis-

agrees, and contends that this particular category of personal injury encompasses only conduct that is (1) undertaken by one claiming an interest in property, and (2) intended to deprive "the injured party of its right to privately occupy" that property. Def.'s Br. at 8. The policy, Westchester adds, does not cover intrusions that only have an incidental effect upon occupancy. The parties agree that Arst's complaint does not allege that Pipefitters intended to deprive Arst of its right of occupancy, or to take possession of the premises for itself. Their disagreement, then, is limited to whether the restrictive gloss Westchester places on "wrongful entry or eviction or other invasion of the right to private occupancy" provision of its policy is correct.

 Westchester is on solid ground regarding the term "eviction." There are two variants of eviction, actual and constructive. Both, in their plain and ordinary meaning, denote actions taken by landlords with the intent to deprive tenants of their right to occupy or enjoy leased premises. *Zion Indus., Inc. v. Loy*, 46 Ill.App.3d 902, 5 Ill.Dec. 282, 285, 361 N.E.2d 605, 608 (1977); *Goldberg v. Cosmopolitan Nat'l Bank*, 33 Ill.App.2d 83, 178 N.E.2d 647, 649 (1961); *Dolph v. Barry*, 165 Mo.App. 659, 148 S.W. 196, 198 (1912). The catch-all phrase "other invasion of the right to private occupancy," however, has a less precise meaning. At first glance, nothing in the phrase seems to require that the "invader" bear any intent to deprive the occupant of possession. Viewed in this light, the term clearly encompasses the tortious conduct alleged in Arst's complaint. Pipefitters' negligent failure to provide a warning that the transformer contained PCBs (Arst alleges) led to the imposition on the Madison site of both a seal order, which restricted Arst's access thereto, and an environmental reclamation lien, which clouded its title. A reasonable policyholder would surely believe that Pipefitters, as a consequence of its alleged negligence, impaired Arst's right to occupy its property. *See Titan Holdings Syndicate, Inc. v. City of Keene*, 898 F.2d 265, 272–73 (1st Cir. 1990) (Fairchild, J.) (New Hampshire law).

But we cannot reach such a conclusion so quickly. Although the term "other invasion of the right to private occupancy" is fairly general and elastic, it does not stand alone; it is part of a more complete definition of "personal injury," directly following two more specific terms, "eviction" and "wrongful entry." The principle of ejusdem generis—a principle the parties in *Titan Holdings* apparently did not raise—provides that where a general term follows a series of specific terms, the former should not be given its broadest possible meaning, but rather extends only to matters of the same general class or nature as the terms specifically enumerated. Accordingly, we must interpret the catch-all phrase "other invasion of the right to private occupancy" as encompassing only conduct of the same general type as eviction and wrongful entry. *See Red Ball Leasing, Inc. v. Hartford Accident & Indem. Co.*, 915 F.2d 306, 312 (7th Cir.1990); *Martin v. Brunzelle*, 699 F.Supp. 167, 170 (N.D.Ill.1988). It follows, then, that if an intent to dispossess the injured party of the right to occupy a given premises is part and parcel of both eviction and wrongful entry, then the same holds for conduct falling within the "other invasion" catch-all.

We have already seen that eviction requires such an intent. The parties hotly dispute whether wrongful entry does as well. While the answer is far from clear—the parties' briefs, as well as our own independent research, demonstrate that wrongful entry is neither a well defined nor a widely employed tort—we believe that Pipefitters has the better of the argument. Both Missouri and Illinois courts recognize that wrongful entry is substantially similar to trespass. *See Hansen v. Gary Naugle Constr. Co.*, 801 S.W.2d 71, 74 (Mo.1990) ("[t]he essence of [trespass] is wrongful entry"); *Looney v. Hindman*, 649 S.W.2d 207, 212 (Mo.1983) (en banc); *Wetmore v. Ladies of Loretto*, 73 Ill.App.2d 454, 220 N.E.2d 491, 498 (1966).[2] Further, both jurisdictions—both recently and at common law—have recognized that, to commit a trespass, one need not intend to take possession of the encroached-upon premises, or to deprive occupants of their right to possess those premises. *See Dial v. City of O'Fallon*, 81 Ill.2d 548, 44 Ill.Dec. 248, 251, 411 N.E.2d 217, 220 (1980); *Colwell Sys., Inc. v. Henson*, 117 Ill.App.3d 113, 72 Ill.Dec. 636, 639, 452 N.E.2d 889, 892 (1983); *Hulick v. Scovil*, 9 Ill. (4 Gilman) 159, 170 (1847); *Griesenauer v. Emsco Corp.*, 399 S.W.2d 147, 151 (Mo.App.1965); *Swope v. Ward*, 185 Mo. 316, 84 S.W. 895, 897 (1904) (quoting *Ewing v. Burnet*, 36 U.S. (11 Pet.) 41, 51, 9 L.Ed. 624 (1837)).

Westchester refers us to several authorities which support its interpretation of wrongful entry, *see, e.g., Morton Thiokol, Inc. v. General Accident Ins. Co. of America*, No. C–3956–85, slip op. at 28 (N.J. Sup.Ct.Ch. Div. Aug. 27, 1989) ("Wrongful entry with respect to real estate is the going upon land for the purpose of taking possession of it."), but they are primarily from other jurisdictions. Although Westchester does cite a few Missouri cases, *see, e.g., Glenn v. Funke*, 642 S.W.2d 132 (Mo. App.1982), they are of only marginal relevance. Granted, some of the cases employ the term "wrongful entry" in the context of suits alleging entries upon land with the intent to take possession thereof. *See, e.g., McCullough v. Newton*, 348 S.W.2d 138, 140 (Mo.1961). This does not, however, support Westchester's contention that such intent is a requisite of wrongful entry; trespass can be either negligent or willful, *see Dial*, 44 Ill.Dec. at 251, 411 N.E.2d at 220, and the cases Westchester cites simply involve examples of the willful variety. In light of more relevant authorities such as *Hansen, supra,* and *Dial, supra,* the most Westchester can prove is that the term "wrongful entry" has an ambiguous meaning. That does Westchester little good, for we are required to resolve all ambiguities in the policy language in Pipefitters' favor. *See Wilkin Insulation*, 161 Ill.Dec. at 284,

---

**2.** The Missouri cases admittedly provide more support in this regard than do the Illinois cases, but Westchester cannot be heard to complain, for it contends that this dispute is governed by Missouri law. Def.'s Br. at 48–49.

578 N.E.2d at 930; *Russell Stover Candies,* 649 F.2d at 624.

Accordingly, one can commit a wrongful entry under Missouri and Illinois law without intending to deprive the occupant of his right of occupancy. It follows—despite our understanding of the term "eviction"—that the principle of ejusdem generis does not limit the catch-all phrase "other invasion of the right to private occupancy" to conduct undertaken with a motive to possess or to deprive another of possession. Whether Arst's complaint alleges conduct sounding in wrongful entry, we need not decide, for it arguably alleges an "other invasion." We conclude, then, that Arst's suit against Pipefitters potentially falls within the terms of the personal injury provision in Westchester's policy.

### B.

▮ Our conclusion does not necessarily spell victory for Pipefitters. The Westchester policy also contains a pollution exclusion clause which eliminates, under certain circumstances, coverage for liability arising out of actual or threatened pollution. The clause defeats Pipefitters' claim for coverage here only if (1) it applies, by its terms, to the policy's personal injury provision, and (2) Arst's suit falls within the purview of the clause.

For the purposes of determining the scope of Westchester's duty to defend, we need only reach the first issue. Westchester's pollution exclusion clause, by its terms, applies only to the policy's property damage and bodily injury provisions. It does not purport to restrict coverage for personal injury. *See* Pl.'s App. E, at 17. In marked contrast, the pollution exclusion clause in the International policy expressly denies coverage for "bodily injury, property damage, *or* personal injury arising out of the actual, alleged or threatened discharge ... of pollutants." *See* Pl.'s App. H, at 101 (emphasis added). From this one can draw but one conclusion: personal injury coverage provided by the International policy is restricted by the clause, while such coverage in the Westchester policy is not. *See Titan Holdings,* 898 F.2d at 270.

Westchester's attempts to circumvent the plain language of the pollution exclusion in its policy are disingenuous and misleading—indeed, they are nearly sanctionable—and as such do not warrant any discussion.

In sum, we find that Arst's suit arguably falls within the scope of Westchester's personal injury coverage, and that such coverage is under no circumstances limited by the pollution exclusion clause. Westchester therefore owes Pipefitters a defense against Arst's lawsuit. We acknowledge that our holding, which affords *personal injury* coverage for economic harm to a *business,* might appear odd. However, Westchester spent nearly all of its ammunition maintaining (incorrectly, it turns out) that conduct characterized as "wrongful entry or eviction or other invasion of the right to private occupancy" necessarily encompasses an intent to deprive the injured party of its right to occupy the premises at issue. Neither Westchester nor the Insurance Environmental Litigation Association, which submitted an *amicus* brief urging affirmance, spent any time arguing that the term "personal injury" should be limited to torts that injure natural persons. Westchester has consequently waived this argument, and without the benefit of briefing we are in no position to say anything about its merits.

We also do not determine here whether Westchester must indemnify Pipefitters. The indemnification issue will become ripe only upon completion of the Arst litigation, for its resolution depends upon an analysis of the type of relief, if any, ultimately obtained in Arst's suit. *United Nat'l Ins. Co. v. Dunbar & Sullivan Dredging Co.,* 953 F.2d 334, 338 (7th Cir.1992) (Illinois law); *Century Indem. Co. v. McGillacuty's, Inc.,* 820 F.2d 269, 270 (8th Cir.1987) (Missouri law).

### III.

▮ We turn to Pipefitters' rights under the International policy. As noted, the pollution exclusion clause therein restricts coverage for liability arising from both property damage and personal injury. Consequently, we must address here the

question we previously sidestepped: whether Arst's suit against Pipefitters falls within the purview of the clause. International bears the burden of proving that the exclusion bars coverage. *Economy Fire & Casualty Co. v. Kubik*, 142 Ill.App.3d 906, 97 Ill.Dec. 68, 71, 492 N.E.2d 504, 507 (1986).

The International policy's pollution exclusion clause excludes coverage, in pertinent part, for

[b]odily injury, property damage, or personal injury arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(b) at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste.

Pl.'s App. H, at 101. "Pollutants" are defined as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 102. The definition of "waste" includes "materials to be recycled, reconditioned or reclaimed." *Id.*

The district court correctly concluded that the pollution exclusion clause bars coverage under International's policy for any property damage or personal injury liability Pipefitters might incur as a result of the Arst litigation. First, the Arst facility undoubtedly was a "site ... used ... for the handling [and] storage" of waste. Pipefitters maintains that Arst's scrap metal was a saleable and useful product, and hence not "waste." While Pipefitters does not elaborate on this contention, it obviously draws its substance from the colloquial definition of "waste" (*i.e.*, a substance having no further use or value). The policy, however, expressly gives the term a more refined, technical meaning. To repeat, "waste" includes "materials *to be* recycled, reconditioned or reclaimed"—materials that are often useful and valuable. Arst did not recycle, recondition or reclaim scrap metal on site, but it is undisputed that Arst was in the business of processing scrap for resale to those who did. The scrap on Arst's premises, it follows, was material *to*

*be* recycled, etc., and hence clearly satisfies the policy's definition of waste.

Second, the injuries and damages suffered by Arst arose out of the discharge at the site of PCBs, which, being liquid irritants or contaminants, meet the policy's definition of pollutants. Pipefitters disagrees, arguing that the term "pollutants" does not encompass *any* release of irritants or contaminants, but rather only those releases associated with industrial emissions, waste disposal, or other pollution-generating activities. Pipefitters' contention is somewhat overstated, but raises a valid point nonetheless. The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for "there is virtually no substance or chemical in existence that would not irritate or damage some person or property." *Westchester Fire Ins. Co. v. City of Pittsburg*, 768 F.Supp. 1463, 1470 (D.Kan.1991). Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

To redress this problem, courts have taken a common sense approach when determining the scope of pollution exclusion clauses. *City of Pittsburg*, for instance, held that the clause did not bar coverage for injuries arising from an individual's ingestion of malathion during a municipal pesticide-spraying operation. *Id.* at 1468–71. Similarly, *A–1 Sandblasting & Steamcleaning Co. v. Baiden*, 53 Or.App. 890, 632 P.2d 1377, 1379–80 (1981), *aff'd*, 293 Or. 17, 643 P.2d 1260 (1982), held that coverage was not barred for paint damage to vehicles which occurred during the spraypainting of a bridge. *See also Atlantic Mut. Ins. Co. v. McFadden*, No. 90–

5487, slip op. (Mass.Super.Ct. May 28, 1991) (clause does not bar recovery for apartment-dweller's ingestion of lead paint); *Cole v. Celotex Corp.*, No. 87–6170 (La. Dist. Feb. 15, 1990) (recovery not barred for release of asbestos particles during installation, handling and removal of insulation). The bond that links these cases is plain. All involve injuries resulting from everyday activities gone slightly, but not surprisingly, awry. There is nothing that unusual about paint peeling off of a wall, asbestos particles escaping during the installation or removal of insulation, or paint drifting off the mark during a spraypainting job. A reasonable policyholder, these courts apparently believed, would not characterize such routine incidents as pollution.

There is no need here to determine to what extent, or even whether, we should embrace the limiting principle adopted in the aforementioned cases. Other courts appear not to have done so. *See, e.g., League of Minnesota Cities Ins. Trust v. City of Coon Rapids*, 446 N.W.2d 419, 422 (Minn.App.1989) (pollution exclusion bars coverage for injuries caused by release of toxic gas from Zamboni ice cleaning machine at ice skating rink); *Francis Hardwood Lumber Co. v. Bituminous Casualty Co.*, 190 Ga.App. 231, 378 S.E.2d 407, 409 (1989) (clause bars coverage to company that set wood fire releasing smoke onto roadway and causing multi-vehicle collision). For regardless of how far the limiting principle extends, it would not exempt the discharge at the Arst site from the reach of International's pollution exclusion clause. Events of this nature do not typically ensue from the processing of scrap metal, or from any activity for that matter. In contrast to errant spray paint, dislodged asbestos, or peeled spray paint, one could not characterize the discharge onto land of 80 gallons of PCB-laden oil as anything but pollution. *See Guilford Indus. Inc. v. Liberty Mut. Ins. Co.*, 688 F.Supp. 792 (D.Me. 1988) (coverage excluded for damages resulting from rupture of oil tanks at textile mill and subsequent contamination of stream), *aff'd without opinion*, 879 F.2d 853 (1st Cir.1989). The distinction we draw here between pollution and non-pollution is by no means scientific, but one must remember that insurance contract interpretation "is at bottom a practical art." *Continental Casualty Co. v. Pittsburgh Corning Corp.*, 917 F.2d 297, 301 (7th Cir.1990). The scope of International's pollution exclusion is governed by the expectations of a reasonable policyholder, *Canadian Radium & Uranium Corp. v. Indemnity Ins. Co.*, 411 Ill. 325, 104 N.E.2d 250, 255 (1952); *Behr v. Blue Cross Hosp. Servs., Inc.*, 715 S.W.2d 251, 255 (Mo.1986), and a reasonable policyholder would have to expect that the discharge of PCBs at the Arst site was pollution.

We conclude, then, that the Arst suit arises from the release of pollutants at a site used for the handling and storage of waste. As such, the pollution exclusion bars coverage under the personal injury and property damage provisions of International's policy, and the district court correctly held that International did not owe Pipefitters any duties thereunder.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.