Fecteau, J.
The plaintiff, Welch Foods Inc. (Welch), brought this action against the defendant insurer Liberty Mutual Insurance Co. (Liberty Mutual), after Liberty Mutual declined to reimburse Welch for Welch’s claimed defense costs in its litigation of an underlying action. In Count I, Welch seeks a declara-toiy judgment that Liberty Mutual had a duty to defend Welch in the underlying action and breached that duty, Count II alleges breach of a duty of good faith and fair dealing under the policy, and Count III alleges violations of G.L.c. 176D and G.L.c. 93A. Presently before this court is Welch’s Motion for Partial Summary Judgment on Count I and Liberty Mutual’s separate Motion for Summary Judgment on all counts. Welch also moves to strike certain exhibits and statements submitted in support of Liberty Mutual’s Motion for Summary Judgment.
FACTUAL BACKGROUND
The following facts are derived from the summary judgment record. It is necessary to go into some detail regarding the suit that underlies the present insurance coverage question so as to understand how it arose in the context of the underlying suit.
Welch is an agricultural cooperative and food processing corporation organized under the laws of Michigan, comprised of 1,495 growers of Concord and Niagara grapes in the Canadian province of Ontario, and U.S. states of Michigan, New York, Pennsylvania, and Washington. The grape growers and owners are also organized in a separate legal organization, the National Grape Cooperative Association, Inc. (National Co-op), organized in the State of New York, of which Welch is a wholly owned subsidiary.
Welch’s principal manufacturing facilities and most of its 1,300 employees are located in Pennsylvania, Michigan, and Washington. Welch’s General Office is located in Westfield, New York, where “fewer than 100 employees" are employed. According to Richard Alpert, Associate General Counsel with Welch’s Concord, Massachusetts office, Welch has been “headquartered in Massachusetts” since 1983, where 199 employees, *227 Welch’s senior executives, “most of its management functions,” as well as its law department are located.
Liberty Mutual is an insurance company incorporated and existing under the laws of Massachusetts, licensed to transact the business of insurance and with its principle place of business in Massachusetts. Liberty International Canada, located in Ontario, Canada (Liberty International) is a “distinct subsidiary” of Liberty Mutual.[1] Liberty International has its own computer claims system, which is not shared with claims representatives of Liberty Mutual in the United States. Painter Dep. pp. 21, 25-26.
I. The Policy
Liberty Mutual issued to Welch a Commercial General Liability Policy (CGLP), Number TB-681-036801-036 (the policy) with a policy period of September 1, 1996 to September 1, 1997. Most of the contract negotiation, payment of premiums, and procurement activities surrounding the policy occurred in New York. None of these activities took place in Massachusetts. No meetings between Liberty and Welch regarding the policy took place in Massachusetts.
A Personal and Advertising Injuiy Liability Endorsement (endorsement) modifies Coverage B of Section I, and paragraphs 1 and 13 of Section V, Definitions, of the CGLP. A “NOTICE TO POLICY HOLDERS,” summarizing the major changes to the policy, provides in relevant part: “The Insuring Agreement for . . . Coverage B — Personal and Advertising Injuiy Liability is revised to clarify the intent under the Coverage Form not to defend insureds when no coverage exists under the policy.
The endorsement provides that Liberty “will pay those sums that the insured becomes legally obligated to pay as damages because of ‘personal injuiy’ or ‘advertising injury’ to which this insurance applies. [Liberty] will have the right and duty to defend any ‘suit’ seeking those damages. However, [Liberty] will have no duty to defend the insured against any ‘suit’ seeking damages for ‘personal injuiy’ or ‘advertising injuiy’ to which this insurance does not apply. We may at our discretion investigate any ‘occurrence’ or offense and settle any claim or ‘suit’ that may result.” The endorsement expresses a limitation for the amounts covered (Section III) and provides:
Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.
No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTAL PAYMENTS— COVERAGES A AND B.
In the endorsement, “Personal injuiy” is defined as “[¡Injury to the feelings or reputation of a natural person other than ‘bodily injuiy’ or ‘property damage’ ” and [i]njury to intangible property sustained by any organization arising out of one or more of the following offenses:
(1) False arrest, detention or imprisonment;
(2) Malicious prosecution;
(3) Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;
(4) Oral or written publication of material that slanders or libels a person or organization or disparages a person’s or organization’s goods, products or services; or
.(5) Oral or written publication of material that violates a person’s rights of privacy.
Coverage applies to personal injuiy caused by an offense arising out of Welch’s business, “excluding advertising, publishing, broadcasting or telecasting done” by or for Welch. Coverage does not apply to personal injury or advertising injuiy: “(1) Done by or at the direction of the insured with knowledge of its falsity; (2) Whose first publication took place before the beginning of the policy period; (3) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in absence of the contract or agreement.”
The Supplemental Payments Endorsement-Coverages A and B Section provides, inter alia:
We will pay, with respect to any claim we investigate or settle, or any “suit” against an insured we defend:
4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or “suit” including actual loss of earnings up to $250 a day because of time off from work.
Section IV — COMMERCIAL GENERAL LIABILITY CONDITIONS, subsection 2b, captioned, “Duties In The Event Of Occurrence, Offense, Claim, or Suit,” provides: “If a claim is made or ‘suit’ is brought against any insured, [the insured] must immediately record the specifics of the claim or ‘suit’ and the date received [and notify Liberty] as soon as practicable.” Subsection 2.c further provides that the “insured must:
(1) Immediately send [Liberty] copies of any demands, notices, summons or legal papers received in connection with the claim or ‘suit’;
(2) Authorize us to obtain records and other information;
(3) Cooperate with us in the investigation or settlement of the claim or defense against the ‘suit’; and
(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply."
*228 Finally, Subsection 2.d provides: “No insured will, except at that insured’s own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.”
II. The Underlying Action
The present dispute between Welch and Liberty Mutual arises out of a declaratory judgment action instituted by Welch in the General Division of the Ontario Court against Cadbury Beverages Canada, Inc.[2] (Cadbury). Welch Foods, Inc. v. Cadbury Beverages Canada, Inc., No. 97-CQ-120413 (O.Ct.J., Feb. 26,1999) (Pitt, J.), aff'd in part and rev’d in part, [2001] O.J. No. 275 (O.J. Feb. 1, 2001) (“Cadbury Action”). Ex. 1. Welch claims Liberty Mutual breached its duty to defend Welch against Cadbury’s counterclaims and seeks reimbursement for its litigation costs and fees in the underlying suit.
A. Welch’s 1996 Statement of Claim
In the Cadbury Action, Welch asserted that its predecessor granted Cadbury’s predecessors a license to manufacture and sell its grape and prune juice products in Canada. According to Welch, this earlier agreement was amended and/or replaced in 1972 by a new licensing agreement (License Agreement). Under the Licensing Agreement, Cadbury had the exclusive right to use in Canada all trademarks relating to various Welch products. Welch asserted, however, that Cadbury did not have the right to subcontract — or enter into a “co-pack” agreement for — the manufacturing of Welch’s products to others. Welch claimed that Cadbury improperly entered into such a co-packing arrangement with Imperial Flavors, Inc. (Imperial). Welch sought a declaration that the Licensing Agreement required Cadbury “to manufacture and market all products” sold by Cadbury “which bear the Welch trademarks, except prune nectar, and that sub-contracting others to do so is not permitted under the terms of the Licensing Agreement!.]” Alternatively, if the court found the Licensing Agreement allowed Cadbury to subcontract, Welch sought a declaration that Cadbury may not do so without Welch’s express written consent, that Welch did not grant its consent, and that Welch’s refusal to consent to the manufacture of its products by Imperial was not unreasonable. Ex. 1.
B. Cadbury’s Defense and Counterclaim of April 11, 1997
On April 11, 1997, Cadbury filed a Statement of Defense and Counterclaim (Defense and Counterclaim),[3] representing itself as a corporation incorporated and subsisting under the laws of Canada, which produces and sells, inter alia, certain products under the trademark “Welch’s” including grape juice in various forms, jams, and jellies. Def. & CountercL, pars. 4-5. Cadbury asserted that it developed a strong market in Canada for Welch products through more than 40 years of marketing investment and product innovation, with increases in sales volumes over “the past decade.” Id., pars. 5-6. Cadbury manufactured all or some ofWelch’s products in its St. Catharines, Ontario facility.
Cadbury claimed to have commenced discussions with Imperial in 1995 to explore the possibility of a co-packing arrangement for frozen juice. Cadbury asserted such an arrangement would “substantially reduce Cadbury’s cost” of production, and that Imperial’s new packaging technology would provide “important competitive advantages” for Cadbury in the frozen concentrate and drinks market. Cadbury claimed it approached Welch “to obtain Welch’s consent” to use Imperial as a co-packer. Id., pars. 19-24. According to Cadbury, Welch consented, at first, and Cadbury and Imperial entered into a written Interim Co-packing Agreement in February 1996 for the production of frozen juice. Id., pars. 26-30.
Cadbury asserted that Cadbury’s Canadian President Ron Segal notified Welch’s president Dan Dillon of Cadbury’s intention to close its St. Catharines plant in April 1996 and that Cadbury’s plan was to transfer the production of Frozen Juice to Imperial under a formal co-packing agreement. In a letter dated August 12, 1996, Welch informed Cadbury that “Welch hereby withdraws its consent to the limited co-packing arrangement entered into between Cadbury and Imperial in February of this year” but also noting that “Welch is prepared to consider a fresh proposal put forth by Cadbury” for a co-packing arrangement. Bier-man Sup. Aff., Ex. 47.
Cadbury asserted that senior officials of Welch thereafter intentionally took various steps as part of a strategy to “attempt to force or induce Cadbury to abandon its rights and obligations under the Licensing Agreement, to concoct grounds to terminate the Licensing Agreement or to otherwise expropriate the license.” CountercL par. 38 (Bierman Aff., Ex. A). According to Cadbury, Welch:
“(a) . . . unreasonably, in bad faith and contrary to its earlier agreement. . . purported to withdraw its consent” to the co-packing agreement with Imperial;
“(b)... unreasonably, and in bad faith and contrary to its earlier agreement... withheld its consent” for Imperial to co-pack;
“(c) . . . advised Cadbury that co-packing arrangements would not be permitted for the production of any Welch products;
(d) . . . attempted to secure long term control of Cadbury’s raw material supply . . . and in that process attempted to coerce Cadbury to withdraw from a competitive bidding process for the purchase of Niagara and Concord grapes grown in Canada . . . contrary to [Canada’s] Competition Act;
(e) “engaged in bad faith negotiations with Cadbury” by failing to provide promised co-packing quotes, “while simultaneously attempting to obtain control *229 of the raw material supply ... so as to .. . put Cadbuiy in a position where it would have no choice but to accept unreasonable co-packing quotes from Welch’s”;
(f) “carried out a campaign to harass Cadbuiy . . . [and] cause Cadbuiy to incur further unnecessary expenses relating to the production of Welch’s product” at St. Catharines; and
(g) “wrote letters threatening Imperial and Cadbuiy’s supplier of cans for the Frozen Juice, Sonoco, Inc.”
Id., par. 39.
As part of its strategy to secure long term control of Cadbury’s raw material supply (Niagara and Concord grapes) used for production of Welch’s products, Cadbuiy claimed that for 40 years it had purchased “substantially all” of its grapes for Welch’s grape products from Ontario’s Niagara region grape growers and that Welch sought to have the Ontario Growers join the National Co-op. Cadbuiy alleged that had Welch been successful, “Welch’s would have secured control of virtually the entire Niagara and Concord grape crop of the Ontario Growers for the foreseeable future.” Cadbuiy saw this as an attempt by Welch to force Cadbuiy into a disadvantaged negotiating position with Welch. Cadbuiy alleged, however, that only approximately 15% of the growers actually joined the National Co-op.
In its Reply to Demand for Particulars regarding “the specific acts which constitute the alleged campaign to harass as referred to in paragraph 39(f)” of Cadbuiy’s Defense and Counterclaim, Cadbury refers to a letter from Bruce N. Futtner, Vice President, Legal Affairs of Mott’s North America, to Clare Howe, Senior Corporate Counsel for Welch, dated October 29, 1996. The letter sets forth additional factual allegations by Cadbuiy regarding alleged conversations and meetings between Mott’s Canadian president Ron Segal, and Welch’s president Dan Dillon.
Futtner’s letter describes attempts by the two companies to set up working groups to meet to discuss Welch co-packing for Mott’s Canada’s Welch’s products. Futtner alleged, “Mr. Dillon also indicated . . . that if Welch’s were to take on the expanded manufacturing role it was proposing for itself, it would need to expand its U.S.-based National Grape Co-op into Canada.” Although “quite concerned” about the prospect of losing control over their raw material supply, Futt-ner stated that Cadbuiy/Motts was prepared to live with that outcome, provided they could reach an agreement with Welch on “a long-term co-packing and/or grape supply arrangement.” The letter described how negotiations between the two companies broke down, and Futtner accused Welch of pursuing a strategy of keeping Cadbuiy/Motts “at bay until it had locked up the Niagara region grape supply and then could dictate terms under which Welch would co-pack product for sale in Canada.”
Futtner claimed Cadbury/Motts responded by “offering the Niagara region growers the option of entering into long-term supply agreements with Mott’s Canada, as an alternative to joining Welch’s Co-op.” Futtner alleged: “Shortly thereafter, both Dan Dillon and Bill Hewins, in separate communications, threatened to retaliate against us if we interfered with Welch’s plans to expand its Co-op into Canada.” Futt-ner also claimed that Dillon threatened that if it was “successful in its attempts to expand into Canada, [Mott’s] ‘would not see a single grape’ from Welch’s.”
Futtner alleged that after Welch’s attempt to control the grape supply failed, Welch devised a strategy to interfere with its ability to use its supply by questioning the quality of the grapes it received from its growers. Futtner claimed that Welch, without forewarning, notified them that “the grape harvesting practices that [Mott’s/Cadbuiy] had been following for many years were no longer acceptable” and that, effective immediately “they were required to follow new harvesting procedures.” Although Cadbuiy/Mott’s claimed it and its growers undertook best efforts to comply with the new procedures, Welch allegedly advised them at the end of pressing operation, without having tested the grapes, “that none of the white grape juice pressed from” that year’s harvest could be used in Welch’s products.
Paragraph 39(g) of Cadbuiy’s Defense and Counterclaim references a letter dated November 4,1996, from Welch’s counsel, Clare Howe to Imperial. Howe stated: “By this letter, Imperial is notified that Welch’s does not consent to Imperial as a co-packer of Welch’s products. Hence, Imperial should not enter into any discussion with Cadbury regarding Welch’s products, without Welch’s prior written consent.” Ms. Howe further warned, that “unauthorized use of Welch’s trademarks will force Welch’s to seek appropriate legal remedies against all parties involved in any such unauthorized production. We are sure that you do not wish Imperial Flavours to be joined to any such action.” Bierman Supp. Aff. Ex. 59.
In a separate letter dated November 18, 1996, Ms. Howe wrote to Sonoco Packaging Products, Cadbuiy’s can supplier: “Please be advised that the Mott’s Canada facility in St. Catharines, Ontario is the only currently authorized manufacturing facility for the products packaged in the Welch’s Cans. Therefore, St. Catharines Ontario facility of Mott’s Canada is the only production facility to which Welch’s Cans may be shipped." Bierman Supp. Aff. Ex. 60. Cadbury alleged that Welch “intended to interfere with Cadbuiy’s relationship with Imperial and . . . Sonoco to end Cadbuiy’s entire business of selling Welch’s Products in Canada, and/or to expropriate the license granted to Cadbuiy . . . for little or no compensation to Cadbuiy.” Def & Countercl. at par. 51.
*230 Cadbuiy also asserted the right, pursuant to the Licensing Agreement, to co-pack with Imperial without Welch’s consent or, alternatively, that Welch’s withholding of consent was unreasonable. Its initial claims against Welch included breach of the Licensing Agreement and the legal obligations therein, negligent misrepresentation, violation of Canada’s CompetitionAct, R.S.C. c. C-34, and intentional interference with economic relations. Id.., pars. 46-51. Cadbuiy sought a declaration: (1) that pursuant to the Licensing Agreement, Cadbuiy had the right to enter into any co-packing arrangement; or (2) that Cadbuiy may do so with Welch’s consent, provided such consent is not unreasonably withheld; or (3) that Welch consented to the co-packing agreement with Imperial; or (4) that Welch unreasonably withheld its consent; and/or (5) that Welch is estopped from refusing to grant its consent. Additionally, Cadbuiy sought “damages in the amount of $10,000,000.00 for breach of the Licensing Agreement” and legal obligations, “negligent misrepresentation, unlawful interference with economic relations!.]” Def. & Countercl. at par. 53(g).
C. Cadbuiy’s Amended Defense and Counterclaim of June 20, 1997
On June 20, 1997, Cadbuiy filed an Amended Statement of Defense and Counterclaim (Amended Defense and Counterclaim).[4] Cadbuiy added allegations of trespass and conversion, claiming that in the summer of 1997, Welch “abused its contractual right to conduct an audit” pursuant to the License Agreement. Am. Def. & Countercl. par. 61. Cadbuiy alleged Welch “abused its contractual right to examine documents pursuant to the Licensing Agreement... by making numerous inquiries . . . concerning confidential and competitively sensitive information . . . and by surreptitiously entering into areas in Cadbuiy’s offices and reviewing documents containing such information.” Id. par. 56.
Cadbuiy claimed that during the week of May 12, 1997, Welch officials made inquiries of Cadbuiy’s personnel “concerning the formulae for certain of Cadbuiy’s products and those affiliates which compete with Welch’s” as well as sensitive financial and other documents. Id. par. 57. Welch sent a letter dated May 23, 1997 to Cadbuiy, which Cadbury characterized as “under the pretext of conducting the 1997 Audit, Welch’s requested from Cadbuiy various financial and other documents and information beyond that permitted” under the Licensing Agreement. Id. par. 57.
Cadbuiy claimed that it “specifically informed” Welch’s official, Jim Curran, when he “re-attended at Cadbuiy’s Office on June 2, 1997 . . . [that] he would not have access to the financial documents requested by Welch’s in its May 23, 1997 letter,” and advising him that his access to certain areas, personnel and documents would be limited. Id. par. 58. In spite of this warning, Cadbuiy alleged that Curran “attempted to and did surreptitiously . . . enter certain restricted areas of Cadbuiy’s Office for which he had no authorization whatsoever, including . . . [areas that contained] numerous confidential and proprietary documents . . . review financial and other documents which he was not entitled to examine ... [and] took or copied documents which he was not entitled to examine . . .’’ Am. Def. & Countercl. par 59.
The remedies Cadbuiy sought included “an interim, interlocutoiy and permanent injunction restraining” Welch from: (1) taking steps to terminate the Licensing Agreement; (2) prevent Cadbuiy from entering into a co-packing arrangement with Imperial; (3) “further breaching the Licensing Agreement” or other legal obligations; (4) “further unlawful interference with the economic interests of Cadbury”; (5) examining accounts, records documents or other materials of Cadbuiy or any of its affiliates unrelated to the “manufacture, a sale and advertising” of Cadbuiy products pursuant to the Licensing Agreement (Restricted Documents); (6) using any such previously examined, copied or taken documents or the information contained therein in any manner; and (7) disclosing any such documents to any other person.
To its claim for damages of $10,000,000.00, Cadbuiy added “abuse of its contractual rights under the Licensing Agreement” and “trespass and conversion.” Id. par. 44(g). To its request for an “award of aggravated, punitive and exemplary damages,” Cadbuiy added “[and for] the abuse of contractual rights and tortious conduct set out above . . .” Id. par. 64. Cadbuiy also claimed damages for the increased cost to continue manufacturing at the St. Catharines facility.
D. Welch’s Amended Complaint of December 12, 1997
As a result of Welch’s summer 1997 audit, Welch claimed to have “discovered, for the first time, that the defendant was marketing in Canada a competitive line of non-carbonated grape products under the name ‘C-Plus’. . . [which included] grape drink, wild cherry apple drink and tropical fruit punch.” Welch amended its Complaint to add charges that Cadbuiy breached the License Agreement “in marketing the aforesaid competitive products under the C Plus name” that Cadbuiy denied Welch access to information that would allow it to determine the extent of sales of C Plus flavours and “whether or not [Cadbuiy] is marketing any other products in contravention” of the Licensing Agreement. Welch asserted that Cadbury was in default and sought regular damages of $1,000,000 plus “punitive and exemplary damages in the amount of $500,000.” Am. Compl., pars. 23, 27, 41-42 (Ex. 4).
Welch asserted that “during the course of [its] . . . annual audit of [Cadbuiy], by letter dated May 23, 1997,” Welch requested that Cadbuiy “make available certain documents required pursuant to the disclosure obligations contained in the Licensing Agreement. Included in this request were documents that would have disclosed the extent to which C Plus flavours had been sold and the identity and nature of other products manufactured” by Cadbury, in breach of the *231 agreement. Id. par. 31. Welch’s charge was implicitly responsive to Cadbuxy’s allegation that Welch “abused” and exceeded its auditing rights pursuant to the Licensing Agreement to seek, examine, and copy what Cadbury claimed were proprietary and restricted documents.
E. Judgments of the Ontario Court and Ontario Court of Appeal
The Ontario Court of Appeal characterized the trial court proceedings: “In 1998, Justice R. Pitt presided over a 41-day trial. He heard testimony of 19 witnesses and examined more than 2000 documents. In a 93-page decision, released on March 29, 1999 he found in favor of Cadbury on most issues. Welch appeals from his decision.” Ex. 5 par. 4. As trial court Justice Pitt framed the central issue: “This dispute revolves around the construction of a manufacturing licensing agreement between Welch . . . and Cadbury . . . Before the hearing of the application [for declaratory relief] Welch commenced this action and expanded the relief sought to include in addition to the declaration with respect to co-packing, another declaration that the license agreement can be terminated as a result of Cadbury’s breach of certain ‘non-competiüon’ (a characterization not approved by Welch’s counsel) provisions in the agreement; and for an accounting and disgorgement.” Ex. 7 pars. 1-3.
The court also noted that the “ ‘struggle’ for the control of Niagara grape supply [was] another significant aspect of this litigation, as evidenced by the fact that Cadbury counterclaimed for a substantial sum as a direct result of Welch’s alleged breach of ‘an implied term of the Licensing Agreement that Welch would not take steps, or engage in conduct, which would impair Cadbury’s ability to fulfill its obligations under the licensing agreement or to realize the benefit. . . including an implied term that Welch would not take steps, or engage in conduct which would threaten or encroach upon Cadbury’s supply of. . . grapes.’ ” Id. par 21.
As to the allegations underlying Cadbury’s claim that Welch intentionally interfered with its economic relations, Judge Pitt noted: “In my view, all arguments used in support of [Cadbury’s] hypotheses can support a simpler hypothesis ... of an objective on the part of Welch to appropriate the benefits of the license that Cadbury and its predecessors had enjoyed since 1954.” Id. par. 42. Judge Pitt wrote: “The different characterization by Welch and Cadbury of the conduct ofWelch during the period following the April 18, 1996 announcement [of the closing of St. Catharines] define the core issue for resolution in this litigation.” According to Judge Pitt, Welch characterized its conduct during the period following the announcement of the closing of St. Catharines as taking “appropriate steps to protect its ‘brand equity[.]’ ” Id. par. 43. Framing the primary issue as a dispute between the parties as regarding the co-pack issue, Judge Pitt found that Cadbury had a right to co-pack under the Licensing Agreement with Welch’s consent and that Welch had “unreasonably withheld consent to Cadbury’s belated formal request for approval of Imperial as a co-packer[.]”
There is no mention in Judge Pitt’s decision of claims for or allegations of malicious prosecution, defamation or disparagement. His only reference to Cadbury’s trespass allegation is his finding that in 1997, “Welch decided to perform an audit pursuant to its contractual rights . . . There is no doubt that the audit was out of the ordinary, in that it had not been planned for the year in question and was strategised with this lawsuit in mind." Id. par. 130. Judge Pitt found that Cadbury covenanted “not to manufacture or sell any imitation grape or grape flavoured product” other than Welch’s. Id. par. 215. Based upon the information discovered by Welch during the complained of audit, the court found for Welch, stating that “in so far as Cadbury did supply concentrates of grape drink to Coca Cola (Minute Maid) for making grape drink products and in so far as Cadbury acted as an intermediary in the sale of grape drink products from Coke (Minute Maid) to Pepsi Brothers, Cadbury was in breach” of the Licensing Agreement. The Court held: “Welch is therefore entitled to an accurate accounting of the revenue earned from what appears to have been activities limited in scope and time.” Id. par. 218.
III. The Present Action A. Notice and Correspondence
Welch filed the Cadbury Action in 1996. Cadbury filed its Defense and Counterclaim in April 1997, and the Amended Defense and Counterclaim in June 1997. On November 12, 1997, Stephen Roberts, Welch’s Assistant Treasurer in Westfield, New York, sent a letter to the attention of Dennis M. Ast, National Account Service Manager for Liberty Mutual in the Buffalo, New York office, tendering Welch’s “formal notice” of the Cadbury Action. This was Liberty’s first notice of any potential claim being made against its insured, Welch. Attached to the letter were copies of Welch’s Complaint and Cadbury’s Defense and Counterclaim. Roberts requested that he be advised as to “what Liberty office” would handle the claim. Mr. Ast, as the liaison between Liberty Mutual’s customers and the claims departments, forwarded Welch’s claim to the claims department of Liberty International. Welch made no further requests or demands.
Welch’s claim was received at Liberty International in Canada on November 18, 1997. After receiving a copy of the policy, Thomas Painter, claims manager of Liberty International in 1997, decided to have outside counsel review the question of coverage. He testified: “When I first reviewed the allegations on the statement of claim in general, both the claim from Welch’s to Cadbury and the counterclaim, and the coverage, I had some serious doubts as to whether or not there was any coverage afforded by the policy.” Painter Dep. p. 56. Painter could not remember what “language and phraseology” elicited such concerns.
*232 On December 10, 1997, Painter sent a letter acknowledging receipt of Roberts’ November 12th letter. Painter wrote that Liberty International retained Brian Brock, a Toronto attorney, to “review the allegations as presented” along with the policy, and to “advise as to our position on this claim.” Painter indicated he would discuss the matter further when he received Brock’s legal findings.
In his affidavit, Painter states, “I have been primarily responsible for the handling of the claim by Welch . . . and, in that capacity, am familiar with the facts of this matter.” Painter continues: “After conducting considerable investigation,[5] Liberty International, through a letter dated June 15, 1998 from Brock, conveyed to Welch’s counsel in the Cadbury Action that there may be coverage for the defense of the Cadbuiy Action, but only arising out of two allegations in the Counterclaim by Cadbury.” Other than retaining Brock, there is no record of what steps Liberty International took to investigate the claim.
Welch filed its Amended Complaint adding the C Plus claim on December 12, 1997.
There are no documents in the record of any communications between Brock, Liberty or Welch from December 10, 1997 to June 15, 1998. In a June 15, 1998 letter, Brock notified Joel Richler, the Canadian attorney handling the Cadbury Action on behalf of Welch, that Welch’s policy of insurance “might provide some coverage.” Brock wrote: “At the moment, that coverage is limited to defense obligations only arising out of two allegations in the counterclaim . . . contained in paragraphs 35(f) and 35(g).” The allegations in these paragraphs were that:
(f) Senior officials of Welch’s carried out a campaign to harass Cadbuiy and cause Cadbuiy to incur further unnecessary expenses relating to the production of Welch’s products; and
(g) Welch’s wrote letters threatening Imperial Flavors and Cadbury’s supplier of cans for the frozen juice, Sonoco, Inc.
Brock also noted he had been “told that no decision had been made that these allegations” were covered by the policy, but since it was “possible that these allegations might be covered,” he had been asked to work with Richler “in the defense of them.” Bierman Aff. Ex. F. Brock proposed discussion on how he might assist with the defense, and asked that an associate, RitaBambers, be permitted access to the case documents.
Apparently unbeknownst to Liberty and Brock, the trial in the Cadbury action had already commenced on April 30, 1998. It concluded on June 30, 1998. Welch asserts that it “was forced to defend itself in an expedited discovery schedule and then bench trial.” Painter testified that Liberty had no notice that the matter was proceeding to trial on an expedited basis or otherwise and that he learned from Welch, after the fact,' that the matter had already been tried. Painter testified that “(i]n normal circumstances, the insured communicates with us at all aspects of the claim” citing the conditions section of the policy relating to the insured’s notice obligations. Painter Dep. at 107. On July 2, 1998, Richler sent a letter to Brock, which stated: “As Ms. Bambers may have already told you, the trial in this matter was underway when I received your letter.”
On July 13, 1998, Dennis Ast sent a letter to Richard Howell, Risk Manager for Welch, in Westfield, New York. Ast had responsibility for accounts written out of the New York national sales office, including the policy involved in this case. Ast noted that the Cadbuiy claim was “very complicated” and that he understood Liberty had agreed to “supply a defense on the action brought against Welch’s but not on the counter-claim against Cadbuiy.” During his deposition, Ast testified that he meant Liberty would not cover any portion of Welch’s affirmative claims against Cadbury: “It would be a plaintiff action, not a defense action. So I knew that wouldn’t be covered, just from common sense.” Ast Dep. at 72-73.
In the July 13th letter, Ast also noted: “The difficulty comes in trying to determine the proper allocation between these 2 actions. This matter is further complicated by this matter already being tried and resolved.” Ast inquired whether Welch was “continuing to pursue defense coverage for this matter” and what amount of recovery Welch was seeking. He continued: “I’m unsure of the details of the resolution of this matter and will need those to address this issue.” Bierman Aff. Ex. G.
On September 16, 1998, Roberts sent a letter to Ast identifying that Welch was seeking a “claim in the amount of $758,641.50 for Welch’s defense costs” in the Cadbuiy action. Enclosed with the letter was an analysis, prepared by Welch’s Associate General Counsel, Richard Alpert, “of the Cadbuiy litigation legal fees, expert witness fees, and other associated costs.” Roberts claimed that “(m]ost of the litigation and associated costs incurred relate[d] to Welch’s defense costs.” Roberts wrote that Welch filed simple litigation against Cadbuiy to obtain a declaratoryjudgment, but after Cadbuiy filed its counterclaim, the case “developed into a very complicated and expensive proceeding to include matters of ‘bad faith,’ theft of documents, and interference with business dealings!.]” Bierman Aff. Ex. H.
Because Welch’s claim was being handled by Liberty International, Ast forwarded communications from Howell to Painter at Liberty International in Canada. On December 11, 1998, Painter sent a letter to Howell stating that upon review of Welch’s claim for reimbursement of defense costs, Liberty would pay “only those reasonable defense costs incurred in the defense of the counterclaim against Welch’s.” Liberty “determined that the policy does not apply to defense costs incurred prior to the date defense was tendered” to Liberty, which was November 12, 1997. “In addition,” Painter wrote, “the policy states that ‘No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.’ ” *233 Painter stated that Liberty would “not pay defense costs incurred in Welch’s actions against Cadbury.” Further, Painter stated that Liberty would “not reimburse the Travel Expense costs in the amount of $44,671.76 and the loss of earnings cost in the amount of $23,068.80.” Bierman Aff. Ex. I.
Howell sent two letters to Ast on December 14, 1998 and December 16, 1998. In the December 14 letter, Howell asked what Liberty was offering to pay and for case law in support of Liberty’s positions. In the second letter, Howell attempted to clarify Ast’s misstatement and ascertain what Liberty was proposing to cover.
In his January 19, 1999 letter to Howell, Painter stated: “As previously discussed with Dennis Ast, we cannot respond to your December 14th letter until the judge’s decision is rendered in the case... Once we have the decision, we will review the findings and then we will be in a position to assess the costs that can be attributable only to the defense of the action brought against Welch’s.” Bierman Aff. Ex. J. Howell sent Painter a copy of the Ontario Court’s decision on March 12, 1999.
In his letter dated March 31, 1999, Painter wrote to Howell indicating that he had “anticipated that the court’s decision would help clarify which defense costs were associated with the covered defense and which were associated with the non-covered prosecution.” Painter noted that Liberty International would “immediately proceed to evaluate Welch’s submission of defense costs” and that Welch would “be advised by what portion of those costs” Liberty would pay. Painter reiterated Liberty’s position that its obligation to reimburse for Welch’s “defense extended only to defense of the claim against Welch’s and not to Welch’s prosecution of its claim against Cadbuiy.” Painter wrote that there would “be a need to meet with defense counsel and proceed to a full disclosure of all events that led up to the trial and judgment.” Painter again stated that the claimed employee travel expenses were not incurred with Liberty’s consent. Painter stated that Liberty agreed to “pay reasonable expenses so incurred after the date of tender” but that Liberty would “not pay any additional costs incurred on any appeal.”
Painter disclaimed coverage for “indemnification of any damages that Welch’s may owe Cadbuiy” stating that such “potential recoveiy is for breach of Welch’s agreement to not unreasonably withhold consent,” which does not fall within the policy coverage. Painter wrote: “Liberty Mutual reserves all rights under applicable law and the policy. This letter should in no way be construed as a waiver or estoppel of any of the possible coverage defenses afforded by the policy or applicable law.” Bierman Supp. Aff. Ex. 25.
InaJune25,1999 letter to Howell, Painter stated that Liberty “spent considerable time reviewing the statement of claim, the counterclaim and the judgment to tiy and assess our contractual obligation.” Painter indicated that Liberty was still “prepared to consider costs associated with the defense of paragraphs 35(f) and 35(g) of the counterclaim” and asked for a “detailed list of those costs and how they arise” indicating that the judgment “did not address these areas.”
On March 23, 2000, Attorney Brock sent a letter to Attorney Alpert, expressing Liberty’s continued interest in finding a resolution, but also noting the inability of the two parties “to agree on the issues to be put on the table.” Bierman Aff., Ex. L. The letter claimed: “While I had offered to prepare a list of issues to be discussed, you had indicated to me that you were only prepared to discuss the allocation of costs between the claim and the counterclaim, and to provide us with some time dockets. Following that advice, you telephoned to advise that the proposal to provide time dockets was off the table since it was your view that the summaries already provided contained sufficient details for our purpose.” The letter includes a list of nine matters proposed for discussion, including whether Liberty has a duty to defend and, if so, for what part of the counterclaim and at what cost. Brock wrote: “I would respectfully suggest then that the matters that are felt to be important to one side should be treated with respect by the other.” Contrary to Welch’s characterization, this letter does not deny all coverage: “(I]t does appear to us that if Liberty has a duty to defend the counterclaim, that duty extended to some veiy small parts of that counterclaim.”
B. Legal Costs and Fees Asserted for Cadbuiy Action
According to Alpert’s analysis, Cadbuiy’s counterclaims changed “what was a straightforward case of contract interpretation” into a challenge of Welch’s activities in Canada, including its motives in its conduct toward Cadbuiy after it received notice of the closing of St. Catharines “(the ‘bad faith’ claim),” the activities of Welch’s cooperative to add Canadian members “(the ‘grape supply’ claim)” and “Welch’s ability to conduct financial audits of Cadbuiy (the ‘theft’ claim).” The analysis identifies four issues in ‘Welch’s case, absent Cadbuiy’s issues," and thirteen issues allegedly arising from Cadbuiy’s claims. Welch claims its costs of litigation, inU.S. dollars, as: (1) $111,746.38 in expert witness fees; (2) $792,011.43 total attorneys fees ($311,665.64 for “Pretrial” and $480,345.79 for “Trial Preparation and Trial” fees); and (3) $55,839.70 “Employee travel (discoveries, trial prep, trial).” The costs Welch sought from Liberty totaled $959,597.51.
Alpert allocated the cost of expert fees as $21,908.67 for Welch’s claims, $28,227.68 for Cadbury’s, and $47,240.69 for “mixed costs.” The mixed costs, for two experts, were $14,578.01 and $32,662.68 respectively. According to the analysis, 50% of Don Butte’s expert opinion was on the legitimacy of Welch’s reasons for denial of Cadbuiy’s co-pack request. Alpert identified this as “mostly relevant to the bad faith claim,” and, accordingly, reimbursable by Liberty. The analysis asserts that two-thirds of Lindquist Avey’s expert opinion fees (or $21,775.12) “was allocated to Cadbuiy’s claims, *234 as two of the three issues they addressed responded to Cadbury’s claims.”
Welch’s analysis summarily asserts a “82.6%/17.4% division of trial witness days between Cadbury’s claims and Welch’s claims” and that this “is consistent with the oral discoveries division of 81%/19% . . . Thus, a fair, and best, allocation of attorney’s invoices since the service of Cadbury’s Statement of Defense and Counterclaim is 80% attributable to Cadbury’s claims and 20% attributable to Welch’s claims. 80% of the total $792,011.43 (U.S.) is $633,609.14.” This “logic” is likewise used to allocate $44,671.76 to Liberty for claimed employee travel costs and $23,068.80 for claimed loss of earnings.
The analysis provides no further break down of legal fees and costs. In his deposition for this case, Alpert testified that Welch did not seek reimbursement from Liberty for the costs of filing Welch’s Complaint against Cadbury until the point at which Cadbury asserted its first counterclaim. Id. at 38-39. Alpert testified that he allocated “the cost to first what Welch’s claims would be absent Cadbury’s counterclaim, and, second, the cost attributable to Cadbury’s counterclaim^]” Alpert Dep. at 89. He continued: ‘To the extent that the counterclaim simply duplicated what was part of Welch’s claim, those would not be covered costs. To the extent it went beyond Welch’s claim, it was covered costs.” Id.
Alpert also testified that the issue regarding whether Welch’s refusal to consent to the co-pack arrangement was reasonably or unreasonably withheld was a “contract interpretation claim" and not a covered cost. Id. at 90. Alpert testified that the Ontario Court “read reasonableness ... into the license as it applied to co-packing, and Cadbury certainly would have asserted that that reasonableness requirements or obligation would have been part of the agreement, yes.”
Asked whether Cadbury’s allegation that Welch attempted to replace Cadbury as the sole distributor of Welch’s products was covered by the policy, Alpert testified: “[Y]es, in the context of this case it is covered . . . Because that is part and parcel of Cadbury’s allegations that Welch was acting in bad faith and undertaking conduct to harass Cadbury, deprive them of the benefit of the license agreement, act in a variety of ways that was detrimental to and disparaging of Cadbury, and that was just one of the factors or motives or aspects, if you will, of Cadbury’s claim.” Id. at 108.
As to Welch’s Amended Complaint, Alpert stated: “If you are asking me specifically about the allegations that were added by way of [Welch’s Amended Complaint]... filed December 12th, 1997, it appears that the allegations that were added at that time dealt with the C [P]lus claim, and to the extent that that is, they’re limited to that. I would agree that the costs and fees attributable solely to the C [P]lus issue are not covered [by the insurance policy], and Welch does not seek reimbursement for that.” Alpert Dep., pp. 37, 39 (noting emphasis in testimony). Alpert identified the C Plus claim as Welch’s claim that Cadbury “violated the exclusivity provision of its license agreement by (sic) Welch’s by manufacturing or distributing a product branded C [P]lus that was a grape product in Canada.” Id. at 37-38.
Alpert further testified that Welch was not claiming that Liberty owed Welch any indemnity monies for the amounts paid out to Cadbury in settlement or otherwise, or for costs to appeal the Ontario Court’s February 26, 1999 decision.
C. Welch’s Present Action Against Liberty Mutual
Welch filed its present action against liberty Mutual on June 23, 2000. In Count I, Welch alleges that Liberty Mutual “failed and refused to discharge its duty to defend and has refused to reimburse Welch Foods for its defense costs incurred” in defending the Cadbury Action. Welch seeks judgment: (1) declaring that Liberty Mutual breached its duty to defend; (2) awarding Welch its attorneys fees, costs and other expenses incurred in defending the Cadbury Action “and all other damages sustained as a result” of Liberty’s alleged breach “together with interest accrued and accruing thereon”; (3) awarding Welch its attorney fees and costs in this action; and (4) granting such other relief “as to which Welch Foods is entitled.” Count II alleges breach of implied duty of good faith and fair dealing by Liberty in its handling of and repudiation of Welch’s claim for coverage and seeks damages sustained as a result. Count III alleges that Liberty Mutual violated G.L.c. 176D, andG.L.c. 93A, §§2, 11 of the General Laws of Massachusetts. Welch seeks damages, including punitive damages available under chapter 93A, attorneys fees, and costs.
DISCUSSION
Welch currently moves for partial summary judgment on Count I, seeking a declaration that, as a matter of law, Liberty Mutual had a duty to defend Welch in the underlying claim, it breached its duty, and that Liberty Mutual “must pay for the entire cost of defending the Amended Counterclaim.” Liberty Mutual denies it had any duty to defend or, to the extent such duty existed, Liberty Mutual seeks an allocation of the costs attributable solely to Welch’s defense. Filed under separate motion, Liberty Mutual also moves for summary judgment on all counts.
Summary judgment may be granted only when there are no genuine issues of material fact and the party is entitled to judgment as a matter of law. Mass.RCiv.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of demonstrating the lack of a triable issue. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A moving party who does not bear the burden of proof at trial may prevail on summary judgment by submitting “affirmative evidence” that the non-moving party cannot meet an essential element of its burden at trial, either by negating an essential element of the non-movant’s claim, or by demonstrating that “proof of that element is unlikely to be forthcoming at trial.” FLesner v. Technical Communica *235 tions Corp., 410 Mass. 805, 809 (1991); see Kourouvacalis v. General Motors Corp., 410 Mass. 706, 716 (1991); Girardi v. Gabriel 38 Mass.App.Ct. 553, 554 (1995). The opposing party must then establish, by setting forth specific facts with affidavits, deposition testimony, answers to interrogatories or admissions, that a genuine issue for trial does exist. Mass.RCiv.P. 56(e).
This is a complex case for which the parties submit over two hundred Rule 9A statements of facts supported by a massive amount of documents relating both to the underlying case and the present dispute. Where the characterization of the facts, or reasonable inferences therefrom are disputed they are considered in the light most favorable to the non-moving party. Sarnafil, Inc. v. Peerless Insurance Co., 418 Mass. 295, 296-97, 306 (1994); Hub Associates, Inc. v. Goode, 357 Mass. 449, 451 (1970).
The interpretation of language in an insurance policy presents a question of law for the court. McNeill v. Metropolitan Property Liability Insurance Co., 420 Mass. 587, 589 (1995). If the only dispute is the proper interpretation of the policy language in an insurance contract, only a question of law is raised. Massachusetts Bay Transportation Authority v. Allianz Insurance Co., 413 Mass. 473, 476 (1992). Where both Welch’s and Liberty Mutual’s analyses apply Massachusetts law, this court does the same.
I. Welch’s Motion to Strike
In its opposition to Liberty Mutual’s Motion for Summary Judgment, Welch moves to strike Liberty Mutual’s Exhibit 2 (Cadbuiy Amended Defense and Counterclaim), Exhibit 3 (Cadbury’s Reply to Demand for Particulars with attached letter from Bruce Futtner dated October 29, 1996) and the corresponding statements in Liberty Mutual’s Statement of Undisputed Material Facts and Legal Elements to the extent that they are submitted as proof of the matter asserted. Rule 56(e) of the Massachusetts Rules of Civil Procedure “provides that affidavits used in support or to oppose a summary judgment record ‘shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.’ ” Madsen v. Erwin, 395 Mass. 715, 719 (1985), quoting Mass.R.Civ.P. 56(e). To survive a motion for summary judgment, affidavits must purvey specific facts, Baldwin v. Mortimer, 403 Mass. 142, 144 (1988), not conclusoiy statements or statements of belief. Polaroid Corp. v. Rollins Environmental Services (NJ), Inc., 416 Mass. 684, 696 (1993); Key Capital Corp. v. M&S Liquidating Corp., 27 Mass.App.Ct. 721, 727-28, rev. denied, 406 Mass. 1101 (1989). Hearsay is unacceptable in a summary judgment affidavit. See Symmons v. O’Keefe, 419 Mass. 288, 295 (1995); Madsen, 395 Mass, at 721.
Here, Cadbuxy’s Amended Complaint and its Reply to Demand for Particulars, Exhibits 2 and 3, are relevant in so far as they state the basis of Cadbury’s allegations against Welch, which is necessary to determine whether Liberty had a duly to defend Welch against Cadbury’s counterclaims. Welch concedes these exhibits and statements are “acceptable” to the extent they prove Cadbury made such assertions, and, accordingly, they are considered herein as a record of Cadbury’s assertions relevant to the issue at hand.
Welch’s motion to strike the Painter affidavit and Liberty Mutual’s statement of undisputed facts referencing the Painter affidavit is denied. Although Painter provides no specific facts to support his statement that Liberty conducted “considerable investigation,” Painter was “primarily responsible for” and, therefore, had personal knowledge of the handling of Welch’s claim by the Canadian Office. Further, Painter testified that he sent the copies of Cadbury’s counterclaims and the policy to outside counsel to ascertain its coverage obligation. This court considers Painter’s testimony only to the extent that it reflects his characterization of Liberty International’s investigation.[6]
II. Plaintiffs Partial Motion for Summary Judgment on Count I
A. Did Liberty Mutual Have a Duty to Defend Welch?
Liberty Mutual asserts it has no duty to defend Welch because Cadbury did not allege claims for the type of personal injuries covered by the policy. It is well settled in Massachusetts that an insurer’s duty to defend is broader than its duty to indemnify. Aetna Casualty & Surety Co. v. Home Insurance Co., 44 Mass.App.Ct. 218, 224 (1998). “[T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are ‘reasonably susceptible’ of an interpretation that they state or adumbrate a claim covered by the policy terms, the insured must undertake the defense.” Continental Casualty Co. v. Gilbane Building Co., 391 Mass. 143, 146 (1984), quoting Sterilite Corp. v. Continental Casualty Corp., 17 Mass.App.Ct. 316, 318 (1983). This process involves assessing the types of losses that may be proved as “lying within the range of the allegations of the complaint,” and then determining whether such losses fit within the “expectation of protective insurance reasonably generated by the terms of the policy.” Sterilite Corp., 17 Mass.App.Ct. at 318.
The duty to defend is determined by the facts alleged in the complaint as well as those known to the insurer. Desrosiers v. Royal Insurance Co. of America, 393 Mass. 37, 40 (1984). There is no requirement that the facts “specifically and unequivocally make out a claim within the coverage,” id. at 319, and the duty to defend extends “even to dubious claims” if they fall within policy coverage. Garnet Construction Co. v. Arcadia Insurance, 61 Mass.App.Ct. 705, 707 (2004). When the allegations expressly fall outside the policy coverage, however, the *236 insurer has no duty to defend. Timpson v. Trans-americaInsurance Co., 41 MassApp.Ct. 344,347 (1996).
The underlying suit can be divided into four parts: (1) Welch’s initial affirmative action against Cadbury; (2) Cadbury’s Defense and Counterclaim of April 11, 1997; (3) Cadbury’s Amended Defense and Counterclaim of June 20, 1997; and (4) Welch’s Amended Complaint of December 12, 1997. As to the first part, the parties agree that Liberty Mutual has no duty for Welch’s initial affirmative claim against Cadbury sounding in contract. Cadbury’s Defense and Counterclaim and Amended Defense and Counterclaim, however, raised various tort claims intermingled with its contractual defenses to Welch’s suit. As to Welch’s Amended Complaint against Cadbury, Welch asserts that a portion of the litigation costs it incurred was in defense of Cadbury’s counterclaims.
The policy enumerates coverage for certain personal injuries identified by the conduct of the insured including, inter alia, injury arising out of: (1) malicious prosecution; (2) oral or written publication of material that slanders or libels a person or organization or disparages a person’s or organization’s goods, products or services, and/or (3) wrongful entry into a room, dwelling or premises that the person occupies.
1. Cadbury’s Defense and Counterclaim of April 11, 1997
Welch argues that Cadbury’s Defense and Counterclaim adumbrated claims of malicious prosecution and defamation or disparagement. Liberty Mutual counters that the counterclaim made no reference to either malicious prosecution, defamation, or disparagement and, further, it did not contain allegations relating to the essential elements of any of these claims. See, e.g., Transamerica Insurance v. KMS Patriots, 52 MassApp.Ct. 189 (2001) (finding no libel or slander claim where disparaging comments were not published). Cadbury’s Defense and Counterclaim included breach of the Licensing Agreement, negligent misrepresentation, violation of Canada’s anti-trust laws, and intentional interference with economic relations. It did not expressly state a claim of malicious prosecution, defamation, or disparagement. Thus, the court must consider whether the allegations in Cadbury’s Defense and Counterclaim are reasonably susceptible to the interpretation that it adumbrates claims of malicious prosecution and defamation or disparagement.
Cadbury alleged that Welch’s strategy was to “force or induce Cadbury to abandon its rights and obligations under the Licensing Agreement, to concoct grounds to terminate the Licensing Agreement or to otherwise expropriate the license.” To that end, Cadbury alleged, Welch attempted to secure long-term control of Cadbury’s raw material supply, “carried out a campaign to harass Cadbury” and wrote letters “threatening Imperial and Cadbury’s supplier of cans for the Frozen Juice, Sonoco, Inc.” Cadbury alleged that Welch intended to interfere with Cadbury’s relationship with Imperial and Sonoco, to end Cadbury’s entire business of selling Welch’s Productá in Canada, and to expropriate Cadbury’s License. Welch also points to Cadbury’s assertion that Welch tried to convince the Ontario grape growers to join its affiliated National Co-op, and thereby allegedly secure control of the grape market.
Welch argues that Cadbury’s allegations adumbrate a claim for malicious prosecution. An action for malicious prosecution may be maintained for the unjustifiable prosecution of a civil action. Hubbard v.' Beatty & Hyde, Inc., 343 Mass. 258, 260-61 (1961), citing Rosenblum v. Ginis, 297 Mass. 493, 497 (1937). To maintain an action for a malicious prosecution claim in Massachusetts, the plaintiff must allege that a prior action was brought maliciously, without probable cause, and was terminated in favor of the plaintiff. See Fogg v. First National Bank of Boston, 268 Mass. 25, 26-27 (1929); MacLean v. Naumkeag Trust Co., 268 Mass. 437, 438-39 (1929); 17A Richard W. Bishop, Prima Facie Case — Proof and Defense §39.5 (4th ed. 1997). There had been no prior civil action between Cadbury and Welch that was successfully terminated in Cadbury’s favor. Thus, Cadbury’s Defense and Counterclaim was not reasonably susceptible to the interpretation that it adumbrated a claim of malicious prosecution.
Welch also claims that Cadbury’s allegations “can be reasonably read as logically foreshadowing that Welch Foods disparaged Cadbury and its business practices.” Cadbury’s Defense and Counterclaim contained allegations of injury to Cadbury’s business relationships, but no factual allegations of defamation or disparagement. In her letters to Sonoco and Imperial, Clare Howe made no libelous comments against Cadbury. She did not expressly disparage its manufacturing process, its products, or its services. Likewise, there were no specific allegations that, in its efforts to persuade grape growers to join the National Co-op, Welch published libelous or slanderous material or directly disparaged Cadbury, or its products.
Welch argues that even in the absence of any specific allegations of untrue or disparaging communications to third parties, Cadbury’s allegations could, nonetheless, be read to adumbrate a claim premised on defamation or disparagement, citing Boston Symphony Orchestra, Inc. v. Commercial Union Insurance Co., 406 Mass. 7, 11 (1989). In Boston Symphony Orchestra, allegations that the breach of a contract between Vanessa Redgrave and the Boston Symphony Orchestra “led others to refrain” from hiring the actress was “fairly susceptible” to the interpretation that the cancellation of her engagement to perform was a statement about her which “damaged her reputation.” Id. at 12. The policy in this case differs somewhat from the one in Boston Symphony Orchestra, which broadly covered personal injury arising from libel and slander “or other defamatory (or) disparaging material.” Here, coverage is limited to libel or slander of a person and disparagement of a person’s or organizations goods, products or services.
*237 In Boston Symphony Orchestra, the Supreme Judicial Court looked beyond the complaint to other information known to the insurer, including a demand letter from the plaintiffs attorney asserting the actress’s right “not to be subject to public ridicule or embarrassment” and the letter to the insurer from the insured explaining its expectation that the suit would “involve claims for damage to her personal and business reputation.” Id. at 9. See also Fitzpatrick v. American Honda Co., 78 N.Y.2d 61, 67 (1991) (holding that an insurer is required to “provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage”). Here, Futtner’s letter to Ms. Howe alleged facts that are reasonably susceptible to an interpretation that Cadbury’s claims for interference with business relationships and violations of Canada’s anti-trust law also involved the disparagement of Cadbury’s goods, products or services. Welch allegedly threatened to disrupt and then interfered with Cadbury’s grape supply by first requiring new harvesting practices and then, without testing the harvested grapes, rejecting that year’s harvest for use in Welch’s products. Combined with the letters to Cadbury’s suppliers, Welch’s alleged activities to control the Canadian grape supply could be injurious to Cadbury’s reputation and disparaging of Cadbury’s service, goods, or products.
After undertaking what Painter characterizes as “considerable investigation,” Liberty International acknowledged the potential of some defense obligations arising out of Cadbury’s allegations that Welch carried out a campaign to harass Cadbury and that Welch wrote threatening letters to Imperial Flavors and Sonoco, Inc. Even after the Ontario trial court framed the case primarily as a contractual dispute,[7] Liberty agreed to reimburse reasonable defense costs of paragraphs 35(f) and (g) of the counterclaim brought against Welch. The facts alleged in the complaint, as well as those available to Liberty at the time, are fairly susceptible to the interpretation that Cadbury alleged injury resulting from Welch’s conduct that was disparaging Cadbury’s goods, products or services. Liberty Mutual’s duty to defend was triggered upon notice of these claims.
2. Cadbury’s Amended Defense and Counterclaim of June 20, 1997
In its Amended Defense and Counterclaim, Cadbury added allegations of conversion and trespass. Welch contends the trespass claim equates to the “wrongful entry into a room, dwelling or premises that the person occupies” definition of personal injury and is, therefore, covered by the policy. Welch argues that as the policy does not define the term “wrongful entry” it should be given its reasonable and ordinary meaning. Welch also cites to decisions in other jurisdictions that have found or suggested that trespass allegations are covered under similar policy provisions.[8]
Relying heavily on a First Circuit case, Dryden Oil Co. v. Travelers Indemnity, 91 F.3d 278 (1996), Liberty Mutual counters that “wrongful entry” is a term of art for a specific tort in Massachusetts that refers only to landlord and tenant relationships and, therefore, does not apply in this case.[9] Citing Gidwani v. Wasserman, 373 Mass. 162 (1977), and Tinkham v. Wind, 319 Mass. 158 (1946), the Dryden Oil court opines that “the Massachusetts tort of wrongful entry has yet to be extended beyond trespasses by landlords upon the leased premises.” Dryden OH, 91 F.3d at 287. While a head note to the Gidwani decision does describe the case as “an action for wrongful entry upon a tenant’s premises by a landlord!,]” Justice Abrams actually characterizes the plaintiffs complaint as “an action for breach of contract and tort for trespass,” using the phrase “unlawful entry” rather than “wrongful entry” to describe the landlord’s conduct. Gidwani, 373 Mass, at 163, 165. Tinkham applied the doctrine of “implied covenant of quiet enjoyment for breach of which the life tenant may bring trespass or ejectment!,]” and held that the plaintiff tenant was “entitled to recover nominal damages at least, if the defendant wrongfully entered upon the property.” 319 Mass. 158, 160 (1946).
Liberty Mutual does not cite to any Massachusetts authority holding that a “wrongful entry" is a distinct and separate tort, nor has it provided evidence that the policy was intended to be or should be interpreted according to Massachusetts law. The policy does not define the term. Even assuming this particular policy provision is to be defined by Massachusetts law, this court found no cases distinguishing between a “wrongful entry” and an “unlawful entry” in Massachusetts. Indeed, both phrases have been used interchangeably in relation to trespass. See, e.g., Straus v. Ginsberg, 245 Mass. 278,279 (1923) (describing the procedural history of the trial below as a “[t]ort for damages resulting from an alleged unlawful entry by the defendant [landlord] upon premises occupied by the plaintiff as a tenant”); Beers v. McGinnis, 191 Mass. 279 (1906) (using the phrase “wrongful entry” in the headnotes where the plaintiff alleged trespass claiming the defendant’s “entry . . . was an unlawful breach of her close”); Commonwealth v. Santos, 58 Mass.App.Ct. 701, 706 (2003) (quoting The American Heritage Dictionary of the English Language 1908 (3d ed. 1992) defining trespass as “To commit an unlawful entry to the . . . property ... of another . . . especially to enter onto another’s land wrongfully”); see also Black’s Law Dictionary (7th ed. 1999) (defining “trespass” as “[a]n unlawful act committed against the person or property of another; esp., wrongful entry on another’s real property”).
Therefore, as the policy does not define “wrongful entry,” and Massachusetts law equates the phrase with the tort of trespass, Cadbury’s trespass allegations were reasonably susceptible to the interpretation that it fell within the policy’s coverage as a “wrongful entry into a room, dwelling or premises that the person occupies.” This court is “aided by the principle that doubts about ambiguous insurance policy provisions are to be resolved against the insur- *238 anee company.” J. D’Amico Insurance Co. v. Boston, 345 Mass. 218, 224 (1962).
The elements of trespass are: (1) that the plaintiff had actual or constructive possession of the property; and (2) that the defendant’s entry was intentional and unauthorized. See New England Box Co. v. C&R Construction Co., 313 Mass. 696, 707 (1943); Edgerton v. H.P. Welch Co., 321 Mass. 603,612-13 (1947); Restatement (Second) of Torts, §157. Cadbury alleged that a Welch official exceeded Welch’s legal right to audit pursuant to the Licensing Agreement and “surreptitiously” entered certain restricted areas of Cadbury’s Office “for which he had no authorization” including areas containing “confidential and proprietary documents.” Cadbury expressly added trespass and conversion to its claims for damages. Cadbury also sought an order restraining Welch from examining accounts, records, documents or other materials of Cadbury or any of its affiliates to which Welch had no right of access, from using such information so acquired in any manner, and from disclosing any such documents to any other person. Liberty Mutual’s assertion that the Ontario court framed the claim as a contractual dispute and did not address the trespass claim[10] does not affect the analysis because “(t]he obligation to defend is not, and cannot be, determined by reference to facts proven at trial.” Aetna Casualty & Surety Co., 44 Mass.App.Ct. at 224. Liberty Mutual had a duty to defend Welch against Cadbury’s trespass claim.
3. Welch’s Amended Complaint filed December 12, 1997
Welch asserted it had legal authority pursuant to the Licensing Agreement to perform the audit and acquire the information it sought from Cadbury’s Office. In its Amended Complaint, Welch alleged that the documents it found during the audit led to the discovery that Cadbury had been marketing competitive grape products under the C Plus name in contravention of the Licensing Agreement. A relatively small portion of Welch’s Amended Complaint implicitly included Welch’s defense of the trespass claim; if Welch had authority pursuant to the Licensing Agreement to enter the areas Cadbury claimed were “restricted,” then its entry was not “unlawful.” See Walsh v. Brown, 194 Mass. 317, 319 (1907); Smith v. Eliot Savings Bank., 355 Mass. 543, 548 (1969).
B. Legal Fees and Costs in the Underlying Case
The Plaintiff also requests that summary judgment be entered in its favor as a matter of law that Liberty Mutual “must pay for the entire cost of defending the Amended Counterclaim.” Liberty Mutual argues that even if it had a duty to defend and must reimburse Welch for its legal costs in the underlying case, Liberty Mutual is entitled to “allocate the costs of Welch’s defense to those costs that can be apportioned to covered claims.”
Liberty Mutual essentially raises two issues.[11] The first involves the separation of costs incurred by Welch for the affirmative claim against Cadbury, including Cadbury’s responsive defenses, from Welch’s actual defense of Cadbury’s counterclaims. The second is whether an insurer has a duty to reimburse for defense costs of all counts against an insured by a third party, when only two of the counts fall within the policy coverage. This court addresses these questions seriatum.
1. Welch’s Affirmative Claims and Cadbury’s Defenses
Liberty Mutual’s obligation involves its duty to defend Welch pursuant to the policy contract. Liberty Mutual has no duty under the policy or law to reimburse Welch for the fees and costs of its affirmative claims against Cadbury, either before or after Cadbury responded. Nor is Liberty Mutual required to reimburse Welch for any portion of Welch’s Amended Claim attributable solely to Welch’s affirmative claim on the C Plus issue. Likewise, under its contract, Liberty Mutual has no obligation to reimburse Welch for its litigation fees and costs pertaining to Cadbury’s defenses against any of Welch’s affirmative claims related to the alleged breach of the Licensing Agreement.
In its suit against Cadbury, Welch sought a declaration that the Licensing Agreement did not allow Cadbury to co-pack. This was answered, in large part, by Cadbury’s defensive assertions that Welch misrepresented its intention to allow Imperial to co-pack, and then unreasonably withheld its consent. The Ontario Court treated Cadbury’s allegations of misrepresentation and unreasonable withholding of consent as defenses to Welch’s affirmative contractual claims regarding the co-pack issue. Alpert testified that the issue of whether Welch unreasonably withheld consent was related to the contractual dispute. Clearly Welch would have had to litigate this issue as part of its case in chief even if Cadbury made no additional allegations.
Therefore, this court finds that Liberty Mutual has no duty to reimburse Welch for the litigation costs Welch incurred to counter Cadbury’s contractual defenses that Welch misrepresented its intent to allow co-packing and that Welch unreasonably withheld its consent. Liberty Mutual, likewise, has no duty to reimburse Welch for the legal fees and costs incurred to counter Cadbury’s allegation of “bad faith” relating to Welch’s alleged misrepresentations and unreasonable withholding of consent to co-pack, which was also raised in defense against Welch’s action in contract. Liberty Mutual has no duty to reimburse Welch for the legal and expert opinions acquired in preparation of and during trial relating to Welch’s reasons for denying Cadbury’s co-pack request.
Regarding Welch’s Amended Complaint, Alpert conceded that the costs and fees attributable solely to the C Plus issue were not covered by the policy, and that Welch does not seek reimbursement for that portion. Thus, Liberty Mutual is only obligated to reimburse Welch for the portion of the litigation costs that went solely to defending the trespass issue, a relatively simple matter. Welch merely had to demonstrate it had the authority pursuant to the Licensing Agreement to review the *239 documents that Mr. Curran sought and acquired. The Ontario Court treated this claim accordingly.
The disparagement and harassment claims are not so simple or discreet a matter. The insured bears the initial burden of proving that a loss is within the description of the risks covered by the policy. See Highland Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 230 (1997). In breach of contract cases, a plaintiff must both prove its damages and that the defendant’s breach of the contract caused such damages. Lease-It, Inc. v. Massachusetts Port Authority, 33 MassApp.Ct. 391, 397 (1992). Thus, even assuming it is entitled to be reimbursed for any litigation fees and costs, Welch must provide a reasonably fair and accurate accounting of those costs and fees it incurred solely in defense of Cadbury’s counterclaims. See Snelling v. Smiling, 345 Mass. 634, 636 (1963) (finding that when “damages are sought they must be proved” within the wider principle that the complaining party must establish his claim). Cf. Cummings v. National Shawmut Bank of Boston, 284 Mass. 563, 568 (1934) (establishing criteria for evaluating reasonable costs of attorney services); Sarnia v. Central Oil Co. of Worcester, 339 Mass. 101, 129 (1959) (noting that “the allowance of counsel fees ‘is a matter which easily may become subject to abuse’ ”).
2. Does a Duty to Reimburse Include Non-Covered Claims?
The parties disagree whether Liberty Mutual can further separate its contractual obligations and reimburse Welch only for the portion of Welch’s defense against Cadbury’s counterclaims that are specifically covered by the policy. Without an agreement to the contrary, an insurer’s broad duty to defend generally extends to all counts, even those not specifically covered by the policy. Simplex Technologies v. Liberty Mutual Insurance Co., 429 Mass. 196 (1999) (“That some, or even many, of the underlying claims may fall outside the coverage does not excuse Liberty Mutual from its actual duty to defend these actions”); Aetna Casualty & Surety Co. v. Continental Casualty Co., 413 Mass. 730, 732 n. 1 (1992) (“Although Massachusetts law does not yet provide an answer, the weight of authority places the duty to defend all counts on an insurer which has a duty to defend at least one count of a complaint, barring a contrary agreement with the insured”).
In this case, the policy includes the expressed intent “not to defend insureds when no coverage exists under the policy.” The Coverage B endorsement provides that Liberty “will have no duty to defend the insured against any ‘suit’ seeking damages for ‘personal injury’ or ‘advertising injury’ to which this insurance does not apply.” A duty to defend all claims does not necessarily require the insurer to reimburse defense costs for claims that clearly do not fall within the policy coverage, especially where a sophisticated commercial entity provided its own defense.
On the other hand, “(a]n insurer who unjustifiably refuses or fails to defend its insured, even in good faith, assumes the consequential risks of that breach of its insurance contract. Those risks not only include liability for the amount of the judgment reflecting claims covered by the policy, but also extend to bearing the burden of proof with respect to apportionment of a judgment between claims that were covered by the policy and claims that were not covered.” Palermo v. Fireman’s Fund Ins. Co., 42 Mass.App.Ct. 283, 290 (1997), citing Polaroid Corp. v. Travelers Indemnity Co., 414 Mass. 747, 763-65 & n.22 (1993); Liquor Liability Joint Underwriting Assoc. v. Hermitage Insurance Co., 419 Mass. 316, 323-24 (1995). The Appeals Court found such a result to be “eminently fair” because, in that case, the insurer “could (and should) have participated fully in the defense of the action . . . under a reservation of rights.” Id at 291.[12]
Likewise, if Liberty unjustifiably breached its duty to defend Welch, then Liberty Mutual assumed the consequential risks and bears the burden of proving the allocation of costs between the covered and non-covered defensive claims. Uquor Liability Joint Underwriting Assoc. v. Hermitage Insurance Co., 419 Mass. 316, 323-24 (1995); Palermo, 42 Mass.App.Ct. at 290-91. If it could not prove the allocation, Liberty Mutual would then be required to reimburse Welch for both covered and non-covered defense costs.[13] Thus, whether the burden of proof has shifted depends on whether Liberty unjustifiably breached its duty to defend.
C. Breach of Duty
Welch argues that Liberty Mutual breached its duty under the policy by failing to promptly investigate its claim and provide a defense. Liberty International acknowledged receipt of the claim in a timely manner and obtained the outside services of Attorney Brock for a determination of coverage. Brock waited six months to contact Welch’s litigation counsel and, by that time, litigation was all but over.
First, Welch offers no evidence to demonstrate it was prejudiced in any way by Liberty’s delay or alleged failure to defend. See Doe v. Liberty Mut. Ins. Co., 423 Mass. 366, 371 (1996) (finding no adequate basis for bad faith based on allegations of unreasonable delay where the plaintiff failed to present evidence that he was prejudiced by the delay). Although Welch claims it was “forced” to defend itself in the Cadbury action as a result of Liberty’s delay, a reasonable fact finder could conclude that Welch fully intended to handle the litigation on its own without Liberty’s assistance or involvement, and acted accordingly. Welch’s “formal notice of loss” requested little more than an acknowledgment, which Liberty promptly provided. “(T]here is also nothing in the record to show that any delay in responding to the plaintiffs claim was the result of bad faith or ulterior motives.” Id.; see Boston Symphony Orchestra, Inc., 406 Mass, at 14. A “determination of what constitutes unreasonable delay is ordinarily left to the fact finder” and this record does not justify a ruling as a matter of law. Doe, 423 Mass, at 371.
*240 Second, the policy contains provisions requiring Welch to promptly notify liberty of any potentially covered suit, to promptly provide copies of documents and court papers, and to cooperate with any defense. Pursuant to the policy, the insured and the insurer have a reciprocal duty to cooperate. 14 Couch on Insurance §199:7 (3d ed. 1999 & Sup. 2004). “Notice, consent-to-settlement, and cooperation provisions share a common purpose, [which is] to give an insurer the opportunity to protect its interests.” Augat, Inc. v. Liberty Mut Ins. Co., 410 Mass. 117, 123 (1991). See Metlife Auto & Home v. Cunningham, 59 Mass.App.Ct. 583, 587 (2003). Welch waited seven months before notifying Liberty of the claim. Both before and after notice, Welch incurred significant expenses and costs without Liberty’s knowledge or consent. Welch also failed to send copies to Liberty of discovery order and trial date notices, as required by the terms of the policy. Compare Sarnafil 418 Mass. at 300 (finding summary judgment inappropriate where insured promptly notified insurer of occurrence and sent several letters requesting policy coverage and a defense, but failed to notify insurer and obtain consent prior to arbitration).
Considering the disputed inferences in the light most favorable to Liberty Mutual, a reasonable fact finder could determine that Welch breached the terms of the policy. Before Liberty Mutual could be relieved of responsibility based on Welch’s violations of the policy, however, Liberty Mutual would be required to show that it had incurred actual prejudice. SamaflL, Inc., 418 Mass! at 305. “Itmay veiy well be that [Liberty Mutual] will prevail at trial based on [Welch’s] breaches, a showing of prejudice by [Liberty Mutual], or a finding ... that [Liberty] had acted property!.]” Id. at 306. Thus, summary judgment for either party on this issue would be inappropriate.[14]
As a final note, Welch’s claim that Liberty Mutual breached its duty to defend by refusing to promptly and unquestioningly pay 80% of Welch’s total litigation costs is clearly unreasonable and borders upon being specious, especially given the complexity of the coverage issues and their posture within the framework of the underlying case. Liberty Mutual had every right to request an accounting of the actual costs attributable to its duty and to pay no more than what the terms of the policy oblige. Any suggestion that Liberty Mutual was obliged to accept and reimburse Welch for whatever amount it demanded, in effect handing to Welch a blank check, or risk litigation for refusal to do so, hints of litigious strong-arming and is a tactic which should not be countenanced within the community of reasonable people of business and is not favored here.
D. Recovery of Litigation Costs and Expenses for the Underlying Action
Even if Liberty had breached its duty to defend as a matter of law, Welch has not proven it is entitled to reimbursement for the litigation costs it seeks. Cadbury’s contractual defenses, for which this court has found Liberty had no duty to defend, were intermingled with Cadbury’s affirmative counterclaims for which a duty to defend did lie. Welch did not ensure the segregation of the legal costs and fees for these claims. In seeking reimbursement from Liberty, Welch submitted an analysis prepared by Alpert that summarily allocated 80% of all Welch’s litigation costs to Liberty Mutual. Liberty Mutual contests Welch’s allocation and has consistently maintained that Alpert’s analysis does not adequately break down the litigation costs so as to enable Liberty Mutual to fairly determine its obligation. This court agrees.
Welch’s analysis includes costs for which the policy did not provide coverage and Liberty Mutual has no obligation to pay, regardless of any alleged breach. Therefore, in response to this decision, Welch must remove from its request for reimbursement any litigation costs and expenses attributable to Cadbury’s defenses against Welch’s affirmative claim, including costs related to the co-pack issue such as allegations of misrepresentation, bad faith negotiation, and unreasonable withholding of consent. As previously discussed, whether Liberty Mutual is obligated to reimburse Welch for its defense of Cadbury’s counterclaims not covered by the policy, and who has the burden of proof of such allocation, hinges on whether Liberty unjustifiably breached its duty to defend.
Genuine issues of fact also exist as to whether Liberty Mutual is required to reimburse any or all of Welch’s expenses. In addition to its duty under the policy, Liberty had a contractual right to be involved in Welch’s defense. The policy clearly limits Liberty’s obligations to pay those “reasonable expenses incurred by the insured” that were incurred at Liberty’s request Liberty did not request such expenditures. A violation of a policy provision bars coverage only where the breach “frustrates the purpose underlying that provision.” Augat Inc. v. Liberty Mutual Insurance Co., 410 Mass. 117, 123 (1991). There are facts in the record from which a jury could reasonably decide that Liberty did not have the opportunity to protect its interests or, alternatively, that Liberty sat on its rights. See SamaflL 418 Mass, at 302.
In summary, Liberty Mutual’s Motion for Summary Judgment as to Count I is denied. Welch’s Motion for Summary Judgment as to Count I is allowed only to the extent that this court declares Liberty Mutual had a duty to defend Welch against Cadbury’s affirmative counterclaims but had no duty in relation to any of Cadbury’s defenses to Welch’s contract claims as identified supra. At a minimum, Liberty Mutual’s obligation to reimburse Welch is limited to those costs reasonably attributable to Welch’s defense against Cadbury’s affirmative claims.
Issues reserved for trial on Count I are whether: (1) Welch breached the terms of the policy and Liberty was prejudiced or can otherwise be released of its responsibilities based on Welch’s violations; or (2) Liberty *241 unjustifiably breached its duty to defend and Welch was prejudiced thereby.[15]
III. Count II: Plaintiffs Claim for Breach of Duty of Good Faith and Fair Dealing
Liberty Mutual moves for summary judgment on all counts, yet fails to brief the court on the Plaintiffs claim for breach of duty of good faith and fair dealing. Because there are genuine issues in dispute and Liberty Mutual does not establish it is entitled to judgment as a matter of law, its motion for summary judgment as to Count II is denied.
IV. Count III: Chapter G.L.c. 176D and Chapter 93A
As both parties are engaged in trade or commerce, Welch brings its chapter 93A claim under Section 11. Nader v. Citron, 372 Mass. 96, 99 (1977). In contrast to Section 9, Section 11 does not grant an independent right to recover for violations of G.L.c. 176D. Polaroid Corp. v. The Travelers Indemnity Co., 414 Mass. 747, 754 (1993). Thus, even assuming that Massachusetts law applies,[16] Liberty’s alleged violations of G.L.c. 176D would be “of significance only to the extent that the alleged wrongful conduct was a violation of G.L.c. 93A, §2 (’unfair or deceptive practices’).”[17] Id.
Liberty Mutual asserts it is entitled to summary judgment on the chapter 93A claim because the complained of actions and transactions did not occur primarily and substantially within the Commonwealth. “[Tjhe burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.” G.L.c. 93A, §11. The burden here is on Liberty Mutual.
Whether the alleged unfair or deceptive act or practice of which Welch complains occurred primarily or substantially within the Commonwealth is not a determination that can be reduced to a precise formula. Kuwaiti Danish Computer Co. v. Digital Equipment Corp., 438 Mass. 459, 470-75 (2003). Rather, this court considers its findings of facts within the context of the entire claim to determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within Massachusetts. Id. It is not.
Liberty Mutual provided evidence that the insurance policy involved in this case was negotiated, procured, and the premiums paid for primarily in New York. There is no evidence in the record that any such activities occurred in or from Massachusetts. The notice of loss was sent by Mr. Roberts to Mr. Ast, in New York. The Cadbury Action was instigated and defended in Canada, and most of the correspondences between Liberty Mutual and Welch regarding the Cadbury Action took place between New York and Canada. Except for Mr. Alpert, the key players involved in this present suit live and work outside Massachusetts, including Mr. Painter, in Canada, and Mr. Howell, Mr. Roberts and Mr. Ast, all in New York. See Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622, 637-39 (1985) (allowing defendant’s summary judgment motion where the defendant’s deceptive statements over the telephone from his Massachusetts office to the plaintiff located in New York were received, acted on, and caused loss in New York).
Welch argues that it suffered the financial loss at its corporate headquarters in Massachusetts. The alleged place of injury or loss does not necessarily determine the question, however, unless some deceptive or unfair conduct also occurred in Massachusetts. Makimo U.S.A, Inc., v. Metlife Capital Credit Corp., 255 Mass.App.Ct. 301, 309-10 (1988). Even accepting that the loss occurred in Massachusetts, Liberty Mutual’s actions simply do not rise to the level of deception or unfair conduct prohibited by G.L.c. 93A, §§2 and 11. Liberty did not abandon the case or refuse to defend. See Hanover Insurance Co. v. Golden, 436 Mass. 584, 588 (2002) (noting that evidence of bad faith abandonment may provide the basis for relief under G.L.c. 93A). Liberty acknowledged there may be coverage, with some reservations, expressly reserved its rights several months later, then continued to seek a resolution with Welch regarding coverage. There is no evidence that Liberty engaged in unilateral self-serving conduct during this contractual dispute. Contra Massachusetts Employment Ins. Exchange v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995) (finding that parly’s unilateral self-serving conduct during course of contract dispute was not fair dealing in good faith). Even if Liberty had refused to defend, which it did not, “[a] refusal to defend that is reasonable, although ultimately shown to be erroneous, does not give rise to liability under G.L.c. 93A.” Golden, 436 Mass, at 595 n.6 (Sossman, J., dissenting), citing Polaroid Corp. v. Travelers Indem, Co., 414 Mass. 747, 754 (1993); Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 14-15 (1989).
Welch also claims Liberty’s failure to commit to a specific dollar amount of coverage is unfair and deceptive. Any failure on Liberty’s part to make a clear coverage commitment to Welch, however, is directly related to Welch’s reciprocal failure to provide Liberty with a reasonably itemized accounting of the litigation costs solely attributable to its defense of Cadbury’s counterclaims. See Mechanics Natl Bank v. Killeen, 377 Mass. 100, 109 (1979) (“Not every unlawful act is automatically an unfair or deceptive one”). Liberty repeatedly requested that Welch provide a more detailed accounting of Welch’s costs and made several offers to meet and seek resolution.
Thus, even considering all disputed facts and reasonable inferences therefrom in the light most favorable to Welch, there is simply no conduct by Liberty sufficiently “unethical, immoral, oppressive, or unscrupulous” to be a violation of c. 93A. Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 505 (1997), citing Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). *242 Therefore, the Defendant’s Motion for Summary Judgment on Count III is ALLOWED.
ORDER
For the foregoing reasons, it is hereby ORDERED that Welch’s Motion to Strike be ALLOWED in part and DENIED in part, as indicated and incorporated herein.
It is hereby further ORDERED that Plaintiff Welch’s Motion for Partial Summary Judgment be ALLOWED only to the extent that the Defendant, Liberty Mutual, owed a duty to defend Welch against Cadbury’s counterclaims as specified in the Memorandum of Decision and Order.
It is hereby further ORDERED that Defendant Liberty Mutual’s Motion for Summary Judgment be ALLOWED as to Count III, and DENIED as to Counts I and II.

Liberty Mutual and Liberty International are collectively referred to as Liberty.

A1so known as Cadbury Schweppes Powell Limited and Motts Canada.

Supp. Aff. of Amice Bierman, Ex. A, Oct. 17, 2003.

Liberty Mutual submits copies of the Amended Defense and Counterclaim (Ex. 2), and Cadbury’s Reply to Demand for Particulars (Ex. 3). Welch’s Motion to Strike Exhibits 2 and 3 and Liberty Mutual’s corresponding statements of fact to the extent that they are offered to prove the truth of the matter asserted therein is discussed infra.

elch moves to strike the Painter Affidavit (Exhibit 14), specifically the claim that Liberty conducted “considerable investigation.” The motion is discussed infra.

Welch’s protest relates to its argument that Liberty breached a duty to investigate Welch’s claim. The “duty to investigate,” however, relates to whether the insurer has a duty to defend. See Tenia v. McDonough, 16 Mass.App.Ct. 163, 168 (1983) (noting that where “the allegations lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate”). See also Timp-son v. Transamerica Ins. Co., 41 Mass.App.Ct. 344, 352-53 (1996). Liberty International obtained outside counsel to investigate whether it had a duty to defend.

While the outcome in such a case can determine indemnification obligations, and may assist the insurer in separating the defense costs for which it is obligated, from those for which it is not, “(t]he obligation to defend is not, and cannot be, determined by reference to facts proven at trial.” Aetna Casualty & Surety Co., 44 Mass.App.Ct. at 224.

Although not controlling, several jurisdictions “equate the policy’s use of the term ‘wrongful entry’ to the tort of trespass” where state law does not direct otherwise. Scottish Guarantee Insurance Co. v. Dwyer, 19 F.3d 307, 311 (7th Cir. 1994); see Pipefitters Welfare Education Fund v. Westchester Fire Insurance Co., 976 F.2d 1037 (7th Cir. 1992) (noting that “[b]oth Missouri and Illinois courts recognize that wrongful entry is substantially similar to trespass”); Titan Holdings Syndicate, Inc. v. The City of Keene, 898 F.2d 265, 267 (1st Cir. 1990) (where the underlying action averred trespass by noxious odors, gases, particulates and lighting emanating from the insured’s property); County of Columbia v. Continental Insurance Co., 189 A.D.2d 391 (N.Y. 1993) (noting that “were it not for its specific pollution exclusion,” the liability policy with a personal injury liability endorsement defining personal injury as, inter alia, injury arising out of the “wrongful entry or eviction or other invasion of the right of private occupancy,” would “clearly cover [the insured’s] claim” where the underlying claim alleged trespass and nuisance from leachate contamination). Cf. Gregory v. Tennessee Gas Pipeline Co., 948 F.2d 203, 209 (5th Cir. 1991) (finding the “wrongful entry” provision did not cover pollution that entered the plaintiffs property where the complaint did not “allege trespass per se" and where there was no “active, intentional conduct”); Garvis v. Employers Mutual Casualty Co., 497 N.W.2d 254 (Minn. 1993) (finding insurance coverage under the personal injury provision for “wrongful entry” but noting a distinction between trespass, “any unlawful interference with one’s person, property or rights” and wrongful entry, defined as “the invasion of an interest in real property”).

See also W.H. Breshears v. Federated Mutual Insurance, 832 F.Sup. 288, 291 (E.D.Cal. 1993) (“A wrongful entry takes place when someone other than the landlord claims a pos-sessory interest in the room, dwelling or premises”).

Noting that “Welch decided to perform an audit pursuant to its contractual rights," even if the audit was “out of the ordinary” and strategically planned, the Ontario Court found Cadbury had breached its covenant not to manufacture or sell any imitation grape or grape flavored product other than Welch’s.

Another question, which appears in the record but was not raised in this motion, is whether Liberty Mutual has any duty to reimburse Welch for the costs and fees incurred by Welch prior to its tender of notice. See, e. g., American General v. Progressive Casualty, 110 N.M. 741, 747 (1990).

Returning a verdict against the insureds in the underlying action, the jury in Palermo had not been asked to allocate damages between the various uncovered and potentially covered claims. Palermo, 42 Mass.App.Ct. at 285. The Court reasoned that had the insurer participated, and explained to the trial judge “the need for a verdict which would require the j ury separately to state their findings as to liability and damages between the [covered and noncovered] claims, it is likely that the judge would have employed other special questions to accomplish that result." Id. at 290. Here, it is unclear whether Liberty had a fair opportunity to participate. There no evidence that Liberty Mutual agreed to relinquish its rights to defend the underlying action and allow Welch to pick its own legal team. See Sullivan v. Utica Ins., 439 Mass. 387, 406-07 & n.13 (2003). Further, as Welch controlled the defense, it arguably could structure both its argument and the court’s findings in such a way that Liberty could not have because of Liberty’s potential conflict of interest.

This does not relieve Welch of its own duty of good faith and fair dealing to reasonably account for, and to withdraw from its reimbursement request, litigation costs related to Cadbury’s defense of Welch’s contract claims for which it has no rightful expectation.

Although Welch seeks recovery of its litigation fees and costs to litigate the present claim in Count I of its Complaint, this issue is neither raised in the Plaintiffs motion nor briefed by either party. Accordingly, this court does not reach the question.

The issues of whether Liberty Mutual must reimburse Welch for both covered and non-covered claims and which party bears the burden of proof regarding the allocation of costs and expenses is left for the trialjudge to decide, directing the court’s attention, to the extent it is applicable, to Palermo v. Fireman's Fund Ins. Co., 42 Mass.App.Ct. 283, 290 (1997).

Although the parties’ choice of law analyses allows for the interpretation of the insurance contract under Massachusetts law on other issues in this decision, application of G.L.c. 93A and G.L.c. 176D is a different matter. This court need not reach this question, however, as I find no violation of chapter 93A as a matter of law.

There would be no viable basis for applying G.L.c. 176D if the laws of another state applied.